| | |
|---|---|
| **JANE DOE R.B.**, | Case No.: |
| Plaintiff, | |
| vs. | |
| **ASHEVILLE ACADEMY FOR GIRLS, LLC; TRAILS ACADEMY, LLC; TRAILS CAROLINA, LLC; WILDERNESS TRAINING & CONSULTING, LLC; FAMILY HELP & WELLNESS; WTC HOLDCO, LLC; WTCSCL, LLC; and UNNAMED ENTITIES 1-10** | **COMPLAINT AND JURY DEMAND** |
| Defendants. | |

## COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff, JANE DOE R.B., by and through undersigned counsel, and hereby files this complaint against Defendant Asheville Academy for Girls, LLC; Defendant Trails Academy, LLC; Defendant Trails Carolina, LLC; Defendant Wilderness Training & Consulting, LLC; Defendant Family Help & Wellness; Defendant WTC Holdco, LLC; Defendant WTCSL, LLC; Unnamed Entities 1-10; and their officers, directors, managers, employees and agents (hereinafter collectively referred to as "Defendants") and in support thereof, makes the allegations included herein.

## I.      INTRODUCTION

1

The Troubled Teen Industry ("TTI") is a notorious moniker for a network of for-profit residential mental health programs targeting vulnerable teenagers and young adults. Operating as a cash machine for private equity investors, this industry has developed into a multi-billion-dollar enterprise with unregulated facilities nationwide. These facilities use sophisticated marketing to prey on teens struggling with mental health issues and their desperate families, delivering sham services that leave children worse off than when they arrived.

Increasingly, and as TTI facilities are shut down following resident injuries and deaths, state legislators are catching on to what thousands of families have learned the hard way: TTI facilities are the epitome of profits over people. Families are falsely promised care and development for their children. While insurance typically doesn't cover these months-, and even years-long programs, desperate parents pay hundreds of dollars per day for the chance of helping their children. In reality, kids receive abuse, neglect, humiliation, and labor trafficking, with typically no more than an hour per week of actual therapy from a licensed professional. Children spend the remainder of their time supervised by unlicensed, overworked, underpaid young people with minimal training and often no more than a high school diploma.

This case exposes the devastating reality behind TTI's false promises through the experience of R.B., a then 14-year-old girl whose parents sought help for her anxiety and depression, but instead, at the hands of Defendants, she suffered systematic abuse and exploitation for over a year. Like thousands of others, R.B. and her parents were drawn in by Defendants' sophisticated marketing promises of safe, therapeutic environments staffed by teen mental health experts with decades of experience who would help their daughter heal. Instead, R.B. received nothing that was promised.

2

R.B. was abused and humiliated; she was physically and sexually assaulted; she was forced to wear diapers and urinate on herself during long, arduous hikes in freezing cold and rain; and she was forced to perform commercial labor, cleaning kitchens, building stables, and laying railroad track. As to therapy, she got no more than an hour a week. What she got instead was untrained and unlicensed staff members punitively removing her access to food, water, and basic hygiene; commanding her not to speak; and shaming her into singing and dancing in front of her peers for apologizing. Most egregiously, she was gaslit and brainwashed into thinking not only that this was all appropriate and somehow beneficial, but that it was all simultaneously her fault and that she deserved whatever pain came out of it.

All of this abuse occurred under the control of Defendants, a web of interconnected entities and investment entities that operated these facilities as profit centers while systematically failing to protect the children in their care. R.B. attended two affiliated facilities in North Carolina: Trails Carolina and Asheville Academy for Girls. Both facilities are now permanently closed following multiple student deaths within the last 18 months. Before North Carolina suspended admissions, revoked their licenses, and forcibly removed all children from their custody, both facilities were wholly owned and controlled by the same corporate defendants.

R.B. and her family trusted the Defendants' promises of healing and relied on their representations of expertise, to their profound detriment. Instead of the recovery Defendants promised, R.B. emerged with severe, life-long injuries that compound the very conditions Defendants claimed they would treat. It has taken R.B. until recently to comprehend the full scope of Defendants' betrayal and see past the systematic brainwashing and psychological manipulation Defendants employed to convince her that the abuse was therapeutic and that she deserved

3

whatever harm they inflicted. This case seeks to vindicate R.B.'s rights and hold Defendants accountable for their systematic exploitation of vulnerable children under the guise of treatment.

## II. PARTIES

1. Plaintiff R.B. is a resident of the state of South Carolina residing in Greenville.[1]

2. The Defendants are a complex collection of interrelated corporate entities, holding LLCs, consulting groups, private equity firms, and several individuals. Several of the entities have rebranded and/or been shut down throughout the years. The following descriptions are all submitted on information and belief.

3. Defendant Trails Carolina, LLC f/k/a/ NCWP, LLC ("Trails Carolina") was a for-profit therapeutic wilderness center for young adults before it closed this year following investigations and a student death. Trails Carolina is a manager-managed limited liability company organized and existing under the laws of the State of North Carolina since June 25, 2008. On its current profile with the North Carolina Secretary of State, Trails Carolina, LLC's principal office address is 500 Winding Gap Rd., Lake Toxaway, NC 28747 in Transylvania County. Trails Carolina, LLC's mailing address is listed as 530 Center Street NE Ste 700, Salem, OR 97301. Defendant Wilderness Training & Consulting, LLC is the manager of Trails Carolina, LLC.

4. Defendant Trails Academy, LLC ("Trails Academy") is a manager-managed limited liability company organized and existing under the laws of the State of North Carolina since March 20, 2014. Trails Academy's principal office address is 555 Sky Valley Camp Rd., Hendersonville, North Carolina 28739, in Henderson County. Trails Academy, LLC's mailing address is 530 Center Street NE Ste 700, Salem, OR 97301. Defendant Wilderness Training & Consulting, LLC

---

[1] R.B. has filed a motion to proceed under pseudonym with this Complaint.

4

is the manager of Trails Academy.

5. Asheville Academy for Girls, LLC ("AAG") was a for-profit residential mental health facility for girls ages 10-18 before it closed this year following two student deaths. Asheville Academy for Girls, LLC is a manager-managed limited liability company. AAG's principal office address is listed at 530 Upper Flat Creek Rd., Weaverville, NC 28787. AAG's mailing address is 530 Center Street NE Ste 700, Salem, OR 97301. Defendant Wilderness Training & Consulting, LLC is the manager of AAG.

6. Defendant Family Help & Wellness ("FHW") is registered as a management consulting company in Oregon. FHW's primary place of business is 530 Center St., NE Ste. 700, Salem, OR 97301. FHW is the larger brand name under which Trails Carolina and AAG, and several other TTI entities, are operated. Defendant Wilderness Training & Consulting is the manager of FWH.

7. Defendant Wilderness Training & Consulting, LLC ("WTC") is manger-managed limited liability company that is part of a larger affiliation of for-profit TTI entities. WTC's primary place of business is 530 Center St., NE Ste. 700, Salem, OR 97301. Defendant WTC HOLDCO, LLC is the manager of WTC.

8. Defendant WTC HOLDCO, LLC is a manager-managed limited liability company with its primary place of business at 530 Center St. NE Ste. 700, Salem, OR 97301. Its self-described business activity is that it "provides financial stability, accounting and marketing services, [and] advice to our partner programs." WTC HOLDCO, LLC is the manager of WTC/FHW.

9. Defendant WTCSL, LLC is a manager-managed limited liability company and a member of WTC. WTCSL, LLC's primary place of business is 530 Center St. NE Ste. 700, Salem,

5

OR 97301. Its self-described business activity is to "provide financial services for accounting, marketing and management for associated partnerships." WTCSL, LLC is a member of WTC HOLDCO, LLC and, upon information and belief, supports, directs, influences, and benefits from the operations of WTC HOLDCO, LLC; WTC/FWH; and Trails Academy, Trails Carolina, and AAG.

10.    Upon information and belief, WTCSL, LLC's membership is a large collection of investing individuals, entities, and private equity groups, all profiting from the wilderness therapy/teen mental healthcare industry and from Family Health and Wellness's operations and programs. On information and belief, WTCSL, LLC's member list includes, but is not limited to, the following entities and individuals:

a.  WTC Holdco, LLC, whose members, according to Trails Carolina, are:

b.  FHW/THP Blocker, Inc., a private equity firm formed in and maintaining its principal place of business in Texas;

c.  PGO, LLC, whose member is Sue Crowell, a citizen of North Carolina;

d.  Opal Creek Capital, LLC, whose member is Tim Dupell, a citizen of Oregon;

e.  Wayne Laird, a citizen of Oregon;

f.  JLC Family, LLC, whose member is Janeny Deblock, a citizen of Washington;

g.  Graham Shannonhouse, a citizen of North Carolina;

h.  Kathryn Huffman, a citizen of North Carolina;

i.  Cat Jennings, a citizen of North Carolina;

j.  Dilly Bean LLC, whose sole member is Bryan Tomes, a citizen of North Carolina;

k.  Jane Gordon, a citizen of North Carolina;

l.  Mary S. Pierce, a citizen of North Carolina;

6

m. Rebecca Gebb, a citizen of North Carolina;

n. SEJC Holdings, LLC, whose sole member is Kyle Gillett, a citizen of North Carolina;

o. FNS Group, LLC, whose sole member is Dan Stuart, a citizen of Utah;

p. Ikaika Holdings LLC, whose sole member is Keoni Anderson, a citizen of Utah;

q. Randi Nelson, a citizen of Utah;

r. Jen Wilde Consulting PLLC, whose sole member is Jennifer Wilde, a citizen of Utah;

s. Laura Burt, a citizen of Utah;

t. Mahalo Nui, LLC, who sole member is Judith Jacques, a citizen of Utah;

u. Scott Hess, a citizen of Utah;

v. Shayne Gallagher, a citizen of Utah;

w. Sheri Gallagher, a citizen of Utah;

x. Jesse Long, a citizen of Oregon;

y. Hayden Dupell, a citizen of Oregon;

z. Kirsten Morgan, a citizen of Oregon;

aa. Matt Roy, a citizen of Oregon;

bb. Steven Stradley, a citizen of Oregon;

cc. Jon Worbets, a citizen of Idaho;

dd. Kathy Rex, a citizen of Idaho;

ee. Reid Treadaway, a citizen of Idaho;

ff. Simpson Holdings, L.C., whose two members are Jeff Simpson and Becky Simpson, who are citizens of Arizona; and

7

gg. White Mountain Consulting LLC, whose sole member is Josh White, a citizen of Arizona.

11.    Unnamed Entities 1 – 10 are partners, members, managing members, or subsidiaries of Defendants who worked with Trails with marketing, advertising, referrals, and provision of services, whose names will be known through discovery.

### III.    JURISDICTION AND VENUE

12.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and the Defendants, and the amount in controversy in this case exceeds $75,000.00, exclusive of costs and interest.

13.    Plaintiff is a citizen of South Carolina.

14.    This Court has general and specific jurisdiction over Trails Academy because its principal place of business is in North Carolina and because it has had minimum contacts with North Carolina, and purposefully availed itself of, and benefited from, directing activities within the state of North Carolina.

15.    This Court has general and specific jurisdiction over Trails Carolina because its principal place of business is in North Carolina and because it has had minimum contacts with North Carolina, and purposefully availed itself of, and benefited from, directing activities within the state of North Carolina.

16.    This Court has general and specific jurisdiction over AAG because its principal place of business is in North Carolina and because it has had minimum contacts with North Carolina, and purposefully availed itself of, and benefited from, directing activities within the state of North Carolina.

17.    This Court has specific jurisdiction over WTC/FHW  because it conducts

8

substantial business in North Carolina and because it manages and directs Trails Carolina, Trails Academy, and AAG, and through that control and oversight, purposefully created minimum contacts with North Carolina when it availed itself of, and benefited from, directing activities in the state of North Carolina.

18.    This Court has specific jurisdiction over WTC HOLDCO, LLC because it conducts substantial business in North Carolina and because it manages and directs WTC/FHW; Trails Carolina; Trails Academy; and AAG, and through that control and oversight purposefully created minimum contacts with North Carolina when it availed itself of, and benefited from, directing activities in the state of North Carolina.

19.    This Court has specific jurisdiction over WTCSL LLC because it conducts substantial business in North Carolina and because, through its membership in WTC HOLDCO, LLC, manages and directs WTC/FHW; Trails Carolina; Trails Academy; and AAG, and through that control and oversight purposefully created minimum contacts with North Carolina when it availed itself of, and benefited from, directing activities in the state of North Carolina

20.    The Court has personal jurisdiction over all Defendants because they conduct business nationwide, including in the state of North Carolina and their misconduct alleged herein took place nationwide, including in North Carolina.

21.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves claims arising from a federal question under 28 U.S.C. §1595(a).

22.    This court has supplemental jurisdiction over the state claims in this case pursuant to 28 U.S.C. § 1367 because the state law claims arise from the same set of operative facts as the claims under 28 U.S.C. § 1581, *et seq.*

23.    Venue is proper in the Western District of North Carolina pursuant to 18 U.S.C. §

9

1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged occurred within this judicial district. Plaintiff attended and was injured at both AAG and Trails Carolina, both of which are residents of this district.

24.     While Plaintiff brings no medical malpractice claims or causes of action, and asserts that claims arise out of the Defendants' neglect, physical and sexual abuse, and forced labor and not medical mistakes, in an abundance of caution, the undersigned asserts, in compliance with Rule 9(j) of the North Carolina Rules of Civil Procedure prior to bringing the instant action, Plaintiff, through his lawyers, have retained an expert witness who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence. Prior to filing the instant complaint, said expert witness reviewed medical care and all records pertaining to the alleged negligence that are available after reasonable inquiry and is willing to testify that the Defendants' acts and omissions did not comply with the applicable standard of care.

25.     Additionally, this pleading alleges facts establishing negligence under the existing common-law doctrine of *res ipsa loquitur*, because it is within the common knowledge, experience and sense of laymen that Defendants should not have required R.B. to suffer deprivation and physical neglect while he was in their custody, and they should not have required R.B. to suffer additional trauma related to sexual abuse and forced labor.

## IV.     FACTUAL BACKGROUND

### A. Defendants Falsely Promised Industry Leading Healthcare in A Safe and Nurturing Therapeutic Environment for Teens Led by Trained and Qualified Professionals

26.     Defendants are a conglomerate of entities and investors.

27.     Defendants have all profited from a network of residential treatment facilities that have generated millions of dollars from falsely marketing themselves as expert mental healthcare

10

providers to desperate families with troubled teenagers.



28. Defendants extensively advertise themselves as 'industry leaders' that provide safe, therapeutic environments staffed by licensed and caring professionals specifically trained and qualified to help vulnerable adolescents heal from anxiety, depression, and trauma.

29. Defendants themselves acknowledge that the children and young adults they market to, and who unwittingly enroll at facilities like Trails Carolina and AAG, suffer from significant and unique vulnerabilities including self-image issues, peer pressure, bullying, low self-esteem, depression, and anxiety - conditions that Defendants knew required specialized protective care

30. Because of those unique mental health issues, students at Trails Carolina and AAG are also at an elevated risk of trauma; substance abuse; emotional management issues; defiant behavior; and mental health disorders, such as depression, anxiety, and mood dysregulation.

31. The risks associated with this population and the accordant unique complexities with treating them are all known to Defendants.

32. With that knowledge and awareness, Defendants consistently claim to have industry-leading expertise in providing services to this unique and vulnerable population.

11

33.     In March of 2016, FHW broadly claimed on its website that "FHW's program partners offer a spectrum of treatment options that serve the varying needs of families."[2]

34.     The same website listed both Trails Carolina and AAG, and stated the following

> "When local options fail or lack the requisite intensity, FHW partner programs step in. Families find us looking for high quality, professional provided care for their child. Across a variety of ages and diagnoses, and program types, FHW program partners provide the answers our families are seeking."[3]

35.     Critically, and just as Defendants presented it to R.B. and her family, FHW marketed its programs as a natural progression, with students moving between them throughout care as the severity of their symptoms and behavioral issues changed.[4]

---

[2] https://web.archive.org/web/20160312062111/http://famhelp.com/programs/spectrum-of-treatment/
[3] *Id.*
[4] *Id.*



36. This step-by-step integration allows Defendants, as they did with R.B. and her family, to trap residents into an endless and profitable relationship wherein the resident stays within Defendants' control and continues paying for unnecessary services.

37. AAG and Trails Carolina, as listed in the above picture, are FHW "program partners" who were all "leading experts in adolescent behavioral health," promising "outstanding care and outcomes."[5]

---

[5] https://web.archive.org/web/20160320172624/http://famhelp.com/resources/frequently-asked-questions/

> **Who are the program partners?**
> FHW partners are some the leading experts in adolescent behavioral health with the education, experience, and passion to provide outstanding care and outcomes.

38.　　FHW claimed to "pursue" accreditations" and that it must meet rigorous standards to maintain those accreditations, while promising again to provide "safe, compassionate, high quality care..."[6]

> Safe, compassionate, high quality care is the cornerstone of every FHW partner program. This is why our programs pursue some of the toughest, most stringent accreditations for operations, clinical treatment, and academics.
>
> These accrediting organizations have standards and/or review processes that FHW programs must meet to obtain and retain accreditations.

39.　　FHW Founder and CEO Tim Dupell personally mispresented that FHW partners, including AAG and Trails Carolina, would treat student with respect and compassion, that families could trust in "increased safety" for their children, and that the partners, again, had extensive experience.[7]

> *Operator ownership creates exceptional dedication. A significant level of operator ownership creates increased safety and consistency that families can trust. Our program owners are fully vested in helping teens and young adults improve their lives.*
>
> *Partner with great people. I only want to partner with great people who care about providing high levels of respect, dignity and compassion. This creates a strong culture and makes it enjoyable to come to work every day.*
>
> *Experience matters. Experience in the industry and passion for helping families combined with strong strategic and financial management creates a sustainable, caring and stable organizational environment.*

---

[6] https://web.archive.org/web/20160320221605/http://famhelp.com/success/accreditations/
[7] https://web.archive.org/web/20160320221134/http://famhelp.com/programs/message-from-ceo/

14

40.     Defendants never marketed the reality of their programs, which was that students were subjected to physical abuse and neglect, food and clothing deprivation, injury, sexual abuse and battery, and forced labor.

41.     Defendants never marketed to R.B. or other survivors that Defendants' staff in fact treated residents with no respect or compassion, and instead removed their dignity through a systematic and consistent process of breaking residents down to ensure compliance.

42.     Defendants knew well before 2016 that their staff had physically, emotionally, and sexually abused residents.

43.     From well before R.B. enrolled at Trails Carolina in late 2016, Defendants knew that its staff were unqualified to supervise, let alone treat, uniquely vulnerable students, like R.B.

44.     Accordingly, Defendants, by and through its owners, officers, managers, employees and agents, have known for years that some of the residents, including R.B., do not learn healthier ways to cope with anxiety and depression, and instead further decompensate in response to Defendants' abusive practices.

45.     Defendants did nothing in response to the continuous and escalating reports of student abuse and neglect.

46.     Defendants hid reports of abuse, manipulated student stories, and failed to report injury events to the North Carolina Department of Health and Human Services, licensing and accreditation regulators, other governmental authorities, and its residents, including R.B., even when faced with objective and documented cause to suspect abuse or neglect had occurred in their programs.

47.     Upon information and belief, Defendants knew or should have known:

15

a) Defendants were unable to provide, and did not provide, the services promised in their marketing materials to children and young adults, including Plaintiff;

b) Defendants put residents, including the Plaintiff, in settings where staff and peers have the opportunity to neglect, physically and sexually abuse and force labor upon him and other residents given the secluded and unsupervised settings;

c) Defendants subject its residents, including Plaintiff, to dangerous outdoors conditions, extremely inclement weather, malnutrition and settings that were life threatening;

d) Defendants condition residents, including Plaintiff, to adhere to the practice of strict obedience of its employees, and encourages an environment of "breaking down" its residents, creating an environment of fear and silence, which creates an environment that fails to protect them from neglect, abuse and forced labor;

e) Defendants promoted the ideas of strict compliance, of not "rocking the boat," and of specifically shaming victims to not tell others what happened and blaming victims for events that occurred, all of which help facilitate a culture that keeps young victims, including Plaintiff, silent and compliant and fosters an environment for neglect, physical and sexual abuse, and forced labor;

f) Defendants essentially trap children and young adults, including Plaintiff, in their programs, providing no way out, even for those like Plaintiff who were over 18.

48.     Defendants failed to disclose to parents and residents, including R.B. and her parents, how little counseling children and young adults in their care receive with a licensed therapist, which is, upon information and belief, an hour or less per week. Instead, Defendants rely on field staff, who are only required to be 21 years old and possess a GED, to "carry out" "individualized" therapeutic treatment plans.

16

49. The result was tragic for the unsuspecting residents, like R.B., at Defendants' partner programs like AAG and Trails, who were promised specialized care and compassion, but were instead subjected to abuse and neglect.

50. Ultimately, for AAG and Trails Carolina, among other partner programs, the result was tragedy, death, license revocation, and facility closure in disgrace and scandal.

**B. AAG Mispresented its Qualifications and Safety for Years and Closed Following Two Teen Suicides in the Same Month**

51. The relevant AAG timeline begins in 2016, as AAG made several misrepresentations and promises in its marketing while R.B. and her family were researching and touring the facility.

52. AAG claimed it was "one of the best therapeutic boarding schools…" that "deeply [understood] the challenges young girls specifically face.[8]

As one of the best therapeutic boarding schools, we want each family to reach success and meaningful change. To do this, we strive to work through each individual student's issues with the involvement of the whole family.

53. AAG promised that its staff underwent a "rigorous interview process" and that AAG ensured "we get the right people into our programs as team members."[9]

**Rigorous Interview Process**

All staff undergo a rigorous interview process including a background check. Of course, we want people who are passionate and capable about helping others, but it is also important that families understand we spend a good amount of time ensuring we get the right people into our programs as team members.

54. AAG expressly stated families, like R.B. and her family, could be "**assured** of a

---

[8] https://web.archive.org/web/20161114093754/http://ashevilleacademy.com/
[9] https://web.archive.org/web/20160415102651/http://ashevilleacademy.com/safe-rtc-campus/

17

higher level of clinical quality and sophistication compared" to unlicensed facilities.[10]

## Licensed as a Residential Treatment Center

It is important to understand that Asheville Academy is a licensed and accredited Residential Treatment Center (RTC). Families can be assured of a higher level of clinical quality and sophistication compared to therapeutic boarding schools and programs not licensed as an RTC. As a licensed RTC, some families may also enjoy higher levels of insurance reimbursement compared to a therapeutic boarding school environment where only a portion of the tuition cost may be eligible for reimbursement.

55. AAG stated in 2016 that "[w]ithout this accreditation and licensing, a family cannot be **assured** of the quality of hiring, the quality of facilities, and the care that is provided."[11]

56. Ultimately, AAG stated its licensure should make families, like R.B. and her family, comfortable with their choice to attend AAG.[12]

## Our status as a licensed Residential Treatment Center is a significant reason to feel comfortable you are making the right choice with Asheville Academy for Girls.

57. As detailed herein, R.B. and her family relied on these representations, which they saw online and were also told in person by AAG/Trails Carolina staff, when deciding to enroll at both AAG and Trails Carolina.

58. These representations were false, as evidenced by the now-known evidence of the reality of resident experiences at AAG, like R.B.'s, that have been uncovered by resident testimonials and investigations.

59. Recent news reports of AAG survivors show extreme abuse and neglect dating back to 2013 when AAG was called Solstice East. At every point, AAG's website, as it always has, was completely void of any warnings as to the true dangers for residents.

---

[10] *Id.*
[11] *Id.*
[12] *Id.*

60.     In one report, an AAG survivor recounted that during her 15-month stay from 2013-2014, she was "tackled to the ground" and restrained "on the ground to the point where I couldn't breathe."[13]

61.     The same survivor recalled seeing other residents subjected to "isolation in solitary confinement, unnecessary strip searches and physical abuse."[14]

62.     Ultimately, AAG's purported treatment just made her "sicker and totally [had] the opposite effect" from its alleged therapeutic intent, leaving her with "nightmares and trouble sleeping at night because [she could] still hear people screaming from, you know, restraints or solitary confinement."[15]

63.     At the same time, AAG's website claimed that it worked to build residents up, not down, and that AAG staff worked hard to build a rapport with residents.[16]

How do we get them engaged again? As you probably have read in our page on "Family Growth" it begins with a relational approach. We work hard to build a rapport with our young ladies, spending the extra time to help them recognize that we are here to build up, not tear down. As time progresses, that relationship serves as a "bank account" from which we make withdrawals, in the form of stepping back and challenging the young ladies to use the skills they have been practicing without direct guidance.

64.     News reports found that Buncombe County Sherriff's Office records dating back to 2016 showed at least 18 incident reports involving AAG, including a suicide, three sex offenses, a missing juvenile, four assaults, an overdose, two child abuse reports, one case of neglect, and three runaways.

---

[13] https://spectrumlocalnews.com/nc/charlotte/news/2025/06/04/i-can-no-longer-stay-silent---former-resident-shares-traumatic-stories-of-attending-solstice-east-now-called-asheville-academy

[14] *Id.*

[15] *Id.*

[16]     https://web.archive.org/web/20140426143231/http://www.ashevilleacademy.com/therapeutic-boarding-school-for-positive-growth/

19

65.     AAG never warned R.B. or her family of these events, and it never listed them on its website.

66.     The North Carolina Division of Health Service Regulation, an arm of the North Carolina Department of Health and Human Services (collectively, "NCDHHS") conducted several inspections of AAG over the years, with consistently alarming findings that were never shared with residents or their parents, including R.B.:

- 2019 investigation that showed AAG failed to develop strategies to help residents, including having no treatment plan to address the suicidal ideation of a resident following 2 prior suicide attempts.

- 2020 investigation found that AAG failed to properly track problem issues with resident care, including 115 mediation errors and 21 restrictive interventions.

- 2022 investigation found that an inadequately trained staff member was fired after sexually assaulting a female patient while wrapping his arms around her to physically pick her up out of a chair – the patient reported being thrown to the grown by the staff member.

- Another 2022 report found that an AAG staff member grabbed a 15-year-old resident from behind and bruised her leg. AAG investigated the assault, but did nothing to protect the student or make her feel safe, despite nursing staff documenting the bruises.

67.     Ultimately, AAG continued on with this practice of abusing residents while maintaining its false façade of marketing until two suicides in May 2025 forced it to close.

68.     On May 3, 2025, a 13-year-old resident of AAG tragically committed suicide.

69.     NCDHHS's investigation found evidence of abuse, neglect, and exploitation at the

20

facility, just as it had in 2019-2022. NCDHHS suspended AAG admissions on May 8, 2025, but the facility remained open.

70.    On May 28, 2025, NCDHHS again suspended admissions at AAG after finding violations of licensing rules that were detrimental to resident health and safety.

71.    On May 29, 2025, there was another resident suicide at AAG, this time it was a 12-year-old girl.

72.    North Carolina state officials removed all residents from AAG following the second suicide.

73.    Finally, AAG announced on June 3, 2025, that it was voluntarily closing.

74.    Recent reporting, citing internal FHW communications, shows that FHW was struggling financially in 2023-2024 due in part to negative industry perception and that it was cutting 11% of its staff as a result.

75.    This was not an isolated incident, or an instance of a few staff members causing problems. This was an extensive and consistent pattern of abuse and neglect with Defendants refusing to protect residents.

76.    As detailed fully herein, Defendants never warned R.B. nor her family of its history of abuse and neglect, or the NCDHHS investigations and findings, and it never, even after she left, warned any later residents of similar risks, even as those risks became undeniably obvious.

77.    Defendants should have warned R.B. and her parents of these knowns risks to AAG residents. Had defendants warned R.B., she would never have attended AAG.

**C. Trails Carolina Misrepresented its Program and Closed Following Student Deaths and License Revocation**

78.    Trails Carolina followed the same tragic arch as AAG, punctuated by student abuse

21

and death with overt misrepresentations and glossy marketing.

79.    In 2015, Trails Carolina advertised that "[i]n fact, Trails is actually an acronym... every letter in T.R.A.I.L.S. stands for one of these values: Trust, Respect, Accountability, Integrity, Leadership, Service."[17]

80.    That same 2015 website claimed that that "Trust" was established "quickly" at Trails Carolina because students learn to trust that "their field instructors will provide for their safety" and "trust the therapeutic process".[18]

81.    Trails marketed itself in 2015 as "dedicated to the safety of your child," and that "safety comes first at trails."[19]

82.    Trails Carolina, like AAG, leaned on an accreditation to create the false impression that the facility was safe and well-run.[20]

## Stringent Standards for Outstanding Levels of Care

Trails Carolina is accredited by CARF, an independent accrediting agency. The rigorous accreditation process CARF requires high standards for safety, business practices, and services. Our accreditation serves to acknowledge that we have met a recognized national standard and submit to regular oversight.

83.    In late 2016, when R.B. and her family were researching facilities, Trails Carolina represented that it was a safe and therapeutic environment founded on "decades of experience and scientific research."

---

[17] Trails Carolina, *About Us, Our Mission as One of the Top Wilderness Programs for Troubled Youth*, https://web.archive.org/web/20151019094048/:80/wilderness-therapy-program/wilderness-program.
[18] *Id.*
[19] https://web.archive.org/web/20150818220314/http://trailscarolina.com/wilderness-therapy-program/safety/
[20] *Id.*

22

Trails Carolina offers Therapeutic Wilderness Programs for troubled teens that is based on decades of experience and scientific research that balances the benefits of wilderness therapy during expeditions with the practical experience of a residential base. Every student spends time in the wilderness and back at base camp to practice skills in a variety of settings and with different staff.

84.     Graham Shannonhouse, Trails Carolina's CEO in 2016, further misrepresented that residents would receive treatment from qualified and licensed medical and mental health professionals. At no point did Mr. Shannonhouse explain that the children would spend nearly all of their time supervised by unlicensed and inadequately trained staff members, most of whom had only a GED or high school diploma[21]

Your family's team will include your child's primary therapist, a family therapist, a medical coordinator, a certified teacher, and an equine specialist. The team takes into account your child in the context of family, peers, school, recreation, and self. This provides a deeper understanding of each student and allows our team to customize your child's treatment plan so that s/he can experience success throughout their varied aspects of life.

85.     In 2016, Trails Carolina advertised that their program was "specifically tailored to meet the demanding developmental needs of Pre-Teens in a safe wilderness camp environment filled with the strong routines, structure, and concrete experiences children this age need."[22]

86.     These representations bely the reality of what residents at Trails Carolina, including R.B., experience.

87.     In 2014, a Trails Carolina resident died while attempting to run away from the facility; this fact and the investigation and its findings were never shared with R.B. or her parents.

88.     The investigating Sherriff released a public statement saying that Trails Carolina

---

[21]     https://web.archive.org/web/20151018161156/http://trailscarolina.com/wilderness-therapy-program/adventure-wilderness-staff

[22] Trails Carolina Website, *Tailored To Meet The Demanding Developmental Needs Of Pre-Teens,* https://web.archive.org/web/20160416053827/http://trailscarolina.com:80/trails-north-carolina/programs-for-troubled-teens/ (archived by Wayback Machine from 2016 Website).

23

was not fully cooperating with the investigation.

89.     The subsequent NCDHHS investigation into the suicide found that Trails Carolina waited five hours after noticing the resident had ran away before calling for search help, and that, had Trails Carolina called for help sooner, they would have had an increased chance of finding the boy before he died.

90.     Several lawsuits filed within the last few years have alleged that Trails Carolina sexually assaulted residents, physically abused them, and denied them basic needs, such as food, water, and adequate clothing during extreme weather. These lawsuits are consistent with other survivors' stories.

91.     Recent reporting shows survivors from 2012 describing experiences nearly identical to those suffered by R.B. The 2012 survivors reported spending nearly all of their time in groups of 8-12, living in tents, and being supervised by minimum-wage earning staff who had no mental healthcare qualifications. Residents went for weeks without access to showers and were denied access to bathrooms. One survivor reported being forced to defecate in his pants, then being made to wear the soiled pants for two weeks.

92.     Overall, the survivors report an environment of shaming and ridicule, during which there was a "break you down to build you up" process through which staff, and even licensed therapist, would shame and humiliate residents as part of their "therapy."

93.     This "break you down" process is the exact opposite of what Trails Carolina and AAG marketed to families and prospective residents.

94.     Former Trails Carolina staff have been quoted as saying that "[o]ne of the issues of the place is that the people that spend the majority of time with them [residents] are not trained therapists." That same former staffer said he was given 3 days of training before being sent into

the woods, unsupervised, with a group of struggling teens.

95.    A Trails Carolina attorney admitted in a letter to the North Carolina Senate that residents receive, at most, 1-2 hours of individual therapy a week.

96.    Survivors of Trails Carolina have consistently stated that their experience at Trails Carolina worsened their mental health struggles.

97.    This is substantiated by the fact that NCDHHS cited Trails Carolina for at least 50 separate deficiencies between 2010-2019.

98.    The NCDHHS violations included citations for violating regulations surrounding seclusion, physical restraint, and isolation; failing to protect residents from harm, abuse, neglect, or exploitation;

99.    Trails Carolina has never acknowledged these reports in its marketing to prospective residents and their families, nor has it ever warned prospective residents as to the true risks and dangers of attending Trails Carolina. Their lack of warning has led to catastrophic results.

100.    In February 2024, a 12-year-old died during his first night at Trails Carolina of asphyxia due to smothering after Trails Carolina staff forced him to sleep in fully enclosed bivy sack.

101.    The boys' death was ruled a homicide.

102.    In May 2024, NCDHHS revoked Trails Carolina's license following the homicide, after it barred the facility from taking new admissions, removed all residents, and fined it.

103.    Trails Carolina took no responsibility for the homicide.

104.    Trails Carolina issued a statement that it was "**surprised** and disappointed to learn of the state's intent to revoke the program's license, given **the progress we've made** and continue to make."

25

105. Trails Carolina appealed the NCDHSS decision but ultimately dismissed its appeal in October 2024.

106. Trails Carolina remains closed today.

107. As with AAG, the stories of Trails Carolina survivors and reports from investigations reveal a long history of resident abuse and neglect.

108. The consistent reports of abuse and neglect are coupled with Defendants' outright obstinance, even after losing licensure, killing a 12-year-old resident, and being forced to close.

109. Defendants never corrected their behavior, they never warned R.B. or her parents of the risks associated with attending Trails Carolina, and they never pulled back from their audacious marketing claims of being an industry leading, safe and therapeutic facility for teens.

**D. R.B. Suffered Abuse and Neglect While Being Labor Trafficked at Trails Carolina and AAG**

110. Like many parents of children and young adults who suffer with mental health and behavioral issues, R.B.'s parents were desperate to find R.B. treatment and solutions for her mental health struggles.

111. Defendants' programs as advertised and marketed appealed to R.B.'s parents.

112. R.B. and her parents relied on the marketing similar to that cited herein when deciding to tour AAG in 2016.

113. During the tour, AAG staff and residents told R.B. that AAG was a safe and therapeutic environment. AAG staff misrepresented to R.B. and her parents that R.B. would spend considerable time with licensed healthcare providers. AAG staff never told R.B. or her parents that R.B. would spend, at most, an hour a week with licensed providers.

114. During the intake process, Defendants' staff gave R.B.'s parents the false

26

impression that the staff members were licensed professionals.

115. R.B. and her parents relied on the statements and misrepresentations made to them directly by Defendants' staff and through Defendants' marketing when ultimately deciding to attend Trails and then AAG.

116. Unbeknownst to R.B. or her parents, Defendants and several of their other facilities were within the "Troubled Teen Industry," a term coined by survivors of such facilities based upon the manipulative and misleading characterizations of these children and young adults by Defendants and other programs in the industry. The term refers to entities that market themselves as an easy solution to fix family dynamics and "troubled teens," but have a dark history of abuse, negligence, and even death.

### *Trails Carolina's "Therapy" Significantly Injured R.B.*

117. Upon arrival at Trails Carolina, a staff member with no medical background conducted a forced strip search of R.B.'s body. The search was conducted with no witnesses present, behind a closed door, in what R.B.'s recalls was a dark closet.

118. Later during her first night at Trails Carolina, R.B. was violently restrained and placed in what Trails Carolina referred to as a "burrito hold," under the guise of treatment.

119. A burrito hold is an abuse restraint practice that entails staff holding a child down in a sleeping bag with the end covering the child's face and body inhibiting their ability to breath, limiting their access to light, and causing their temperature to rise from their own body heat. While within the upside-down bag, they often would be covered and tied with a tarp and/or would be forced to be held down in the middle of staff for the entirety of the night.

120. R.B. later recalls laying in absolute terror throughout the night thinking she might

27

suffocate to death.

121. From the outset, there is an inherent power imbalance in the relationship between a resident and a residential program with temporary care and control for residents', including controlling how R.B.'s, basic needs and well-being were affected.

122. Defendants made every decision about what R.B. could eat, wear, do day-to-day, how often she could talk, and even when she was allowed to talk to her parents. This absolute and tyrannical control was played off to R.B. as a normal part of the program, yet in direct contradiction to Defendants' prior characterizations of Trails Carolina as safe, supporting, and fostering of trust.

123. Trails Carolina staff forced R.B. to write what was known as a "Trails Letter" to her parents, listing all the mistakes and poor decisions she had previously made. She was then forced to stand up in the middle of a group of her peers and read the letter aloud while she sobbed in humiliation.

124. R.B., just like all other Trails Carolina survivors, received, at most, an hour of individual therapy.

125. As "therapy" for R.B.'s known diagnosis of anxiety, staff criticized her for "asking too many questions," knowing she was only 14, away from home for the first time, and in a strange and hostile environment.

126. Staff imposed an insensitive strategy to "remedy" her behavior and literally restricted her to asking only 3 questions per day.

127. Trails Carolina's primitive abuse of R.B. caused her anxiety to skyrocket.

128. As her anxiety was peaking, the unlicensed Trails Carolina staff ridiculed her for being an "anxious apologizer" and punished her by forcing her to take the humiliating action of standing and singing a song in front of her peers whenever she apologized.

28

129. As a result of frequent situations where R.B. was shamed publicly, her peers started to bully and tease her.

130. R.B. was assaulted multiple times by other residents. Trails Carolina did nothing in response, and the assaults continued unabated.

131. Beyond its degradation of R.B., Trails Carolina staff forced her to endure dangerous and negligent conditions throughout her stay.

132. Trails Carolina staff refused to accommodate her dietary needs, forcing her to eat a very limited amount of food. As a result, R.B. lost an extremely unhealthy and dangerou amount of weight, over 70 pounds, in just 77 days at Trails Carolina. This was overt physical abuse.

133. R.B. developed an eating disorder at Trails Carolina that she struggles with to this day.

134. Trails forced R.B. to participate in arduous hikes through the woods carrying an 80-pound backpack through rain and in freezing temperatures.

135. Trails Carolina staff made R.B. remain in wet and cold clothes after forcing her to hike in freezing rainstorms. She got sick at least twice after these events as a result of the exposure and being denied shower access when she returned indoors.

136. As they did with other survivors, Trails Carolina restricted R.B.'s access to bathrooms during the forced hikes. Every girl in her group was forced into the humiliating position of having to urinate on themselves as a result.

137. Rather than treating her with the even the most basic dignity and respect, Trails Carolina forced R.B. to wear a diaper and to urinate on herself during long hikes.

138. Trails Carolina staff forced R.B. to clean the facilities as punishment for alleged violations.

139. Trails Carolina staff forced R.B. to set up and break down camp during the forced hikes.

140. Trails Carolina staff forced R.B. to cook and prepare food for other residents.

141. Defendants purposefully limited options for R.B. and other Trails Carolina residents to report any concerns, abuses, or neglect by the program in order to retain business and keep receiving payments.

142. Trails Carolina's abuse and humiliation of R.B. continued for 77 days. Towards the end of her stay, Defendants marketed and sold AAG as the next step for R.B., convincing her and her parents that her treatment was not finished and that she would see no lasting benefit unless she enrolled for a long stay at AAG.

143. Defendants sold R.B. and her parents on AAG by presenting it as a natural progression from Trails Carolina, just as they did in the marketing referenced herein. Defendants' offered R.B. and her parents a "discount" for the package of attending both, further enticing R.B. and her parents to choose AAG.

144. R.B. and her parents relied on the misrepresentations of Defendants, both in person and in their marketing, when they decided to enroll AAG following Trails Carolina.

### *AAG Abused and Trafficked R.B.*

145. As with Trails Carolina, AAG's staff focused particularly on coercing young people, including R.B., in the program to blame themselves for health conditions and events outside of their control and to feel shame for their health and experiences.

146. This was commonly seen as a "break them down to build them process," which was consistent with R.B.'s experience at Trails Carolina and normalized.

30

147. AAG staff would manipulate residents, including R.B., into compliance by telling them they deserved the abuse, neglect, and mental health struggles they experienced.

148. R.B.'s experience at AAG was unfortunately similar to Trails Carolina.

149. AAG staff ridiculed and publicly shamed R.B., which led again to other residents bullying and assaulting R.B. AAG, just like Trails Carolina, did nothing to curb the bullying and assault that it caused.

150. AAG forced R.B. to wear a hula hoop around her waist, all day, in front of her family, claiming that it was therapeutic.

151. The public shaming and ridicule of being forced to sing and dance and to wear a hula hoop around her family was alleged to be therapeutic; yet, in fact, it caused R.B. to continue to deteriorate.

152. AAG staff routinely used isolation as punishment for alleged behavioral infractions.

153. AAG staff isolated R.B. on several occasions, each time causing her significant distress, which lead to a spiral of her symptoms worsening, then more punitive "therapy" and shaming from AAG staff, then bullying and assault from other residents, then repeat.

154. AAG caused R.B. and other residents significant trauma with the staff's instability and unpreparedness. R.B. never felt safe at AAG as a result.

155. One of these events occurred when a severe snowstorm hit the area of AAG. AAG was not prepared for the storm causing chaos and alarm because they lacked supplies and enough food to sustain the hardship of the storm. The staff panicked in front of the vulnerable and struggling residents, causing R.B.'s symptoms to worsen.

156. AAG forced R.B. to work both on campus and off campus, at private properties,

31

every weekend during the 11 months she was at AAG.

157. R.B.'s forced labor assignments rotated on a weekly basis.

158. One weekend she could be forced to clean the AAG kitchen using industrial cleaners and hazardous chemicals without any protective gear, landscape the property, and cook for staff and other residents.

159. The next weekend she would be taken off campus, where she would be forced to build stables, clear brush, weeding private gardens, or laying railroad track.

160. All of this labor was forced and unpaid. AAG told R.B. that she could never refuse to work and that she must work the entire time she was "volunteering" as AAG cynically categorized the labor.

161. AAG profited from R.B.'s labor both on campus and off campus.

162. AAG never paid R.B. or offered her any benefit for her forced labor.

163. AAG only ever offered R.B. punishment if she refused to do any of the forced labor.

164. AAG's abuse of R.B. continued for 11 months. AAG never delivered the therapeutic promises it made to R.B. and her parents. Her "therapy," as it had at Trails Carolina, consisted solely of manipulation and exploitation.

**E. R.B. Suffered Severe and Permanent Injuries Because of Trails Carolina and AAG**

165. All of R.B.'s mental health conditions and symptoms worsened while she was at Trails Carolina and AAG.

166. Neither Trails Carolina nor AAG offered R.B. the therapeutic services that they both marketed to R.B. and her family.

167. R.B. developed permanent physical and mental injuries as a direct result of Trails Carolina and AAG's abuse.

168. R.B.'s depression and anxiety completely changed into severe and disabling conditions.

169. R.B.'s return from AAG was marred with severe unhappiness and a complete inability to socialize.

170. As she progressed through high school, she developed PTSD symptoms, which have now been related back to the trauma she endured at Trails Carolina and AAG.

171. R.B. developed an eating disorder at Trails Carolina, which AAG exacerbated, and which she still struggles with.

172. The symptoms and conditions that Defendants worsened and caused manifested in R.B. engaging in dangerous behavior.

173. R.B. developed a substance abuse problem as a result of Defendants' abuse.

174. R.B.'s life has been forever changed because of Defendants' abuse, which she has only recently come to realize was as result of their mistreatment of her.

175. R.B. trusted Defendants to heal her, as promised, and their violation of that trust has caused her to struggle with obtaining the care she desperately needs.

176. Defendants' abuse and complete lack of care for R.B. has caused her to develop permanent and severe psychological injuries with which she will struggle for the rest of her life.

177. Defendants' abuse of R.B. has caused permanent damage to her relationship with her family. R.B. will always struggle with her family's recommendation that she attend Trails Carolina and AAG, even though her family was never warned of the shocking reality of both facilities.

178. Defendants promised through their marketing and in direct representations to R.B. and her family that Defendants would help to improve the familial relationship. This never

33

occurred. In fact, Defendants' actions have potentially caused permanent damage to R.B.s relationship with her family.

179. R.B. still struggles with panic attacks, nightmares, flashbacks, and intrusive thoughts, all accompanied by physical symptoms like sweating, shortness of breath, and increased heartrate.

180. Despite the severity of her injuries, R.B. was unable to link her steep decline to Defendants.

181. Throughout her time at Trails Carolina and AAG, the staff manipulated her into thinking everything was her fault, and that they were doing what had to be done to help her.

182. R.B. never realized Defendants' were abusing her until very recently, as Defendants' mistreatment was normalized as part of the program. She similarly did not understand that Defendants trafficked her for forced labor because Defendants consistently and cynically called the labor "volunteering."

183. It was not until recently that R.B. was reasonably able to identify, understand, and discover that what she experienced constituted abuse and neglect, and that this abuse and neglect caused her ongoing symptoms. Defendants systematically convinced her that everything was her fault; that her symptoms and deteriorating mental health were her own doing. She suffered under this psychological conditioning until very recently, when she finally worked through the trauma to understand that the abuse defendants inflicted was not her fault or her own doing.

## V. CAUSES OF ACTION

### COUNT ONE

### Negligence/Gross Negligence

### (Against all Defendants)

34

184.     R.B. realleges and incorporates every allegation of this Complaint as if each were set forth fully and completely herein.

185.     Defendants specifically marketed their services and experiences and invited residents with emotional issues to their therapeutic residential program, including R.B., who was an invitee.

186.     As referenced extensively herein, Defendants held themselves out to R.B. and her family as industry leaders and specialist in the field of teen mental healthcare.

187.     Defendants held Trails Carolina and AAG out as experts in working with children and young adults who had mental health disorders, behavioral concerns, developmental conditions, and social challenges.

188.     Defendants assumed a duty of care for R.B. when they took control and custody of R.B.

189.     R.B. was a minor during the entire time that she was in the custody and control of Defendants.

190.     Defendants ordinarily have a duty to exercise reasonable prudence and foresight in operating their facilities. However, the risk of danger in this situation is unusually high, as the Defendants were responsible for caring for young people with depression and other mental health issues.

191.     A failure to adequately care for these young people could easily lead to a risk of serious harm or death.

192.     Defendants were accordingly under a heightened duty of care towards R.B.

193.     Defendants owed a duty to:

     a. adequately warn of the risk of harm in its program prior to taking custody and

35

large sums of money from the residents' parents, including Plaintiff;

b. adequately train and supervise those persons acting on its behalf on how to guard against, identify, prevent and respond to sexual abuse and battery, as well as other forms of physical abuse and neglect;

c. protect its residents from sexual, physical, and mental abuse; battery and assault; as well as other forms of medical, nutritional and physical deprivation and neglect;

d. adequately investigate reports and suspicions of abuse and neglect of its residents;

e. protect is residents, including R.B., from dangerous, inhumane conditions;

f. provide appropriate and promised services to residents, including R.B.; and

g. perform the services as advertised and marketed to R.B. and R.B.'s parents.

194.    Defendants owed a duty to provide a safe environment for the children and young adults in their custody for a number of reasons in addition to their duties *in loco parentis*, and assumption of duty doctrine, including without limitations, the following:

a.  Defendants undertook and administered psychological therapy, youth-development programs, activities, and services to residents, and as a result assumed a duty to R.B. and other children and young adults to exercise reasonable care in connection with its activities and services;

b.  N.C.G.S. §7B-301 places an affirmative duty upon Defendants, and its employees and agents to report sexual abuse, and N.C.G.S. §7B-310 removes any privilege that Defendants' counselors could otherwise use to shield the failure to report;

c.  Defendants had special relationships with the children and young adults who were entrusted to their care and control, including R.B.;

d.  Defendants were an organization obligated to take reasonable steps to respond to and prevent sexual abuse of the children and young adults who participate in its

36

programs; and

e.  Defendants invited R.B. and other children and young adults onto their property under Defendants' ownership or control, and had an obligation to keep them safe from danger.

195.  Defendants breached their duties to R.B. through several actions, which include but are not limited to, the following:

a.  failing to adopt policies and procedures that required its employees and clinical staff to perform a proper assessment of children and young adults admitted to Defendants' programs that identifies disorders and other factors and developing an individualized plan of care for residents of Defendants' programs;

b.  failing to assure R.B. was placed into a group setting with children and young adults who had similar mental health issues. Upon information and belief, residents in R.B's cohort were at Defendants' programs for trauma related to sexual and physical abuse, and substance abuse;

c.  failing to monitor the premises where it held custody over many residents with pre-existing issues and tendencies, to ensure that they did not do foreseeable harm R.B., who was also an invitee under North Carolina law;

d.  failing to hire and provide sufficiently trained staff and failing to train staff to handle the issues for which it marketed and claimed to provide to residents, including R.B.;

e.  failing to develop any centralized format to ensure that health and safety self-inspections were being performed by Defendants' programs;

f.  failing to systematically review the appropriateness of services and patterns of service utilization at Defendants' programs or adopt policies and procedures that required this to be done;

g.  failing to provide adequate security and safety for residents, including R.B, in their custody;

h.  failing to follow statutory mandates and their own policies and procedures relating to investigating misconduct perpetrated on tis residents, including Plaintiff;

37

i. failing to adequately provide proper clothing, boots, gear, and living conditions to keep residents and R.B. safe from harm;

j. failing to provide adequate food, access to hygiene and medical care to its residents, including R.B.;

k. failing to act as reasonable persons would to protect R.B. and failing to take even the slightest degree of care and were grossly negligent in their disregard for the well being of R.B., who was entrusted to their care; and

l. in such other ways as will be revealed in the course of discovery in this case.

196. It was foreseeable to Defendants that their inadequate policies and procedures, their lack of appropriate supervision and training of employees, their failure to accurately assess their employees' skills or the effectiveness of the services provided to children and young adults, including Plaintiff, and their failure to systemically address ethics, legal requirements, boundaries, trauma, and compliance would result in their residents, including Plaintiff, suffering inexcusable physical harm, neglect and forced labor.

197. Defendants' actions and inactions were the proximate cause of Plaintiff's injuries, causing her to suffer grievous bodily injury, severe anxiety, depression, and an eating disorder triggered by stimuli that reminds her of her experience at Defendants' programs, which leads to a spiral of self-hatred, loathing, emotional pain, and suffering.

198. As a direct and proximate result of the Defendants' negligent acts, Plaintiff has been catastrophically injured and sustained permanent and severe emotional distress.

199. As a result of the Plaintiff's injuries caused by the Defendants, Plaintiff has been under the care of a psychiatrist and mental health clinician, and has developed an eating disorder, causing her physical and emotional pain. Plaintiff continues to be haunted by the abuse she faced at the hands of the Defendants.

200. As the direct result of the foregoing negligent infliction of emotional distress, and the immoral, unethical and unscrupulous manner that Defendants conduct its business, Plaintiff

38

was substantially injured.

## COUNT TWO

### Negligent Infliction of Emotional Distress

### (Against all Defendants)

201.    Plaintiff realleges and incorporates every allegation of this Complaint as if each were set forth fully and completely herein.

202.    Defendants negligently engaged in conduct causing distress to Plaintiff.

203.    It was reasonably foreseeable to Defendants that this conduct would cause severe emotional distress.

204.    Defendants' misconduct did in fact cause Plaintiff severe emotional distress.

205.    Indeed, Plaintiff suffered depression, anxiety and other severe and disabling mental health diagnoses of severe because of Defendants' misconduct.

206.    It is foreseeable to any reasonable person that subjecting someone to extremely harsh living conditions, emotionally and physically abusing them, and forcing them to perform labor for no pay would lead to severe emotional distress. In fact, no reasonable person would expect anything else to result from these actions besides irreparable, egregious harm.

207.    To this day, R.B. experiences pain, suffering, and mental anguish as a result of the Defendants' abuse. This distress has already led to significant lost wages and opportunities, and it is likely to lead to future lost wages and a loss of earning capacity as her mental health and trauma symptoms interfere with her day-to-day life.

208.    As the direct result of the foregoing negligent infliction of emotional distress, and the immoral, unethical and unscrupulous manner that Defendants' conduct its business, Plaintiff was substantially injured.

## COUNT THREE

### (Beneficiary Liability under §1595 (a) of the TVPRA for Violations of 18 U.S.C. § 1584)

39

**(Against all Defendants)**

209. Plaintiff realleges and incorporates every allegation of this Complaint as if each were set forth fully and completely herein.

210. The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

211. Plaintiff was a victim of forced labor trafficking in violation of 18 U.S.C. S 1584.

212. Under, 18 U.S.C. § 1584, it is unlawful to knowingly and willfully hold another person to involuntary servitude or to sell any person into any condition of involuntary servitude.

213. Defendants knowingly held Plaintiff and other trafficking victims in a condition of involuntary servitude and "sold" Plaintiff and other trafficking victims to certain defendants for forced labor through the following acts:

    a. Creating and maintaining a system wherein Plaintiff and other trafficking victims were forced to work against their will both on and off Defendants' properties;

    b. Required Plaintiff and other trafficking victims to work in extreme weather and conditions, and using dangerous chemicals, without protective gear or other precautions;

    c. Profiting from Plaintiff and other trafficking victims' labor by bestowing a free benefit to off-campus entities through the forced labor, and, on information and belief, receiving payment or other benefit from those off-campus entities in exchange for Plaintiff and other trafficking victims' forced and free labor;

    d. Profiting from Plaintiff and other trafficking victims' on-campus/facility labor by using their free labor instead of hiring more staff, thus creating a financial incentive and benefit to continue to force Plaintiff and other trafficking victims to perform what would be otherwise paid labor tasks, such as: cleaning, cooking,

40

transporting gear, setting up and taking down camp, clearing brush, repairing and building stables, gardening, and other general labor and maintenance around Defendants' properties.

e. Maintaining complete control over Plaintiff and other trafficking victims throughout the labor arrangement, dictating when, where, and for how long they would work, and under what conditions;

f. Continuing to utilize and profit from the labor of Plaintiff and other trafficking victims despite resistance and obvious and reported signs of exhaustion, distress, coercion, malnutrition, and illness.

214. The Defendants operate with one common and shared financial interest, which is to profit from their shared facilities and programs.

215. The profit from Trails Carolina and AAG is shared with the named Defendant controlling and managing entities, which in turn is shared with the litany of private investors and equity groups.

216. Trails Carolina and AAG increased profits, and thus shared more profit with the other Defendants, through the labor trafficking alleged herein.

217. As a result of their shared financial interest and the corporate and structural cohesion and control as described herein, all Defendants invariably profited from the labor trafficking of R.B

218. All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, in ways further described herein, each Defendant knowingly benefitted by receiving revenue and other benefits from its participation in a continuing business venture the Defendants knew or should have known was in violation of the TVPRA.

219. Each of the Defendants is liable to Plaintiff under the TVRPA because they have all benefited and conspired to benefit from a continuing business venture in which Plaintiff and other trafficking victims were trafficked, harbored, and sold in violation of U.S.C. § 1584

220. Each Defendant, through the acts and omissions more fully described herein,

41

received a financial benefit from participating in a business relationship in which they recruited, exploited, and manipulated vulnerable kids from desperate families around the country, including Plaintiff.

## **COUNT FOUR**

**(Beneficiary Liability under §1595 (a) of the TVPRA for Violations of 18 U.S.C. § 1589)**
**(Against all Defendants)**

221.     Plaintiff realleges and incorporates every allegation of this Complaint as if each were set forth fully and completely herein.

222.     The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

223.     Plaintiff was a victim of forced labor through threats of harm in violation of 18 U.S.C. § 1589.

224.     Under 18 U.S.C. § 1589(a), it is unlawful to knowingly provide or obtain labor or services by means of: (1) force, threats of force, physical restraint, or threats of physical restraint; (2) serious harm or threats of serious harm; (3) abuse or threatened abuse of law or legal process; or (4) any scheme, plan, or pattern intended to cause a person to believe that they would suffer serious harm or physical restraint if they did not perform such labor or services.

225.     Under 18 U.S.C. § 1589(b), it is also unlawful to "knowingly benefit, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services" by the means described in subsection (a).

226.     Under 18 U.S.C. § 1589(c)(2) the term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, reputational harm…"

42

227. Defendants violated 18 U.S.C. § 1589 because Plaintiff's and other trafficking victims' labor was obtained through extreme emotional abuse and serious harm in the way of malnutrition and deprivation.

228. Defendants profited financially through these violations, and, as such, all Defendants are liable under 18 U.S.C. §§ 1589(b), 1595(a).

229. As more fully described herein, Plaintiff's and other trafficking victims' labor was obtained in violation of 18 U.S.C. § 1589(a) in several ways, including but not limited to the following:

    a. Creating and enforcing a system wherein Plaintiff and other trafficking victims were led to believe that their forced labor was "volunteer" work and that it was therapeutic, when it was neither;

    b. Emotionally abusing and humiliating Plaintiff and other trafficking victims to break them down into a state of full compliance while forcing them to work every week;

    c. Creating and maintaining complete control over Plaintiff and other trafficking victims by controlling their communications both with other residents and their families;

    d. Controlling Plaintiff's and other trafficking victim's access to housing, basic hygiene needs, food, and water, and through that control implementing a punishment system of withholding all said items to force Plaintiff and other trafficking victims into compliance and forced labor;

    e. Systematically undermining Plaintiff's and other trafficking victims' self-confidence and sense of autonomy through psychological manipulation;

    f. Mispresenting the "volunteer" program as legitimate and legal when it was designed to evade labor laws and increase profits;

    g. Using the structure and status of a therapeutic facility to shield forced labor practices from scrutiny and to manipulate families and residents into believing they were performing actual volunteer work;

43

230. The Defendants operate with one common and shared financial interest, which is to profit from their shared facilities and programs.

231. The profit from Trails Carolina and AAG is shared with the named Defendant controlling and managing entities, which in turn is shared with the litany of private investors and equity groups.

232. Trails Carolina and AAG increased profits, and thus shared more profit with the other Defendants, through the labor trafficking alleged herein.

233. As a result of their shared financial interest and the corporate and structural cohesion and control as described herein, all Defendants invariably profited from the labor trafficking of R.B

234. All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, in ways further described herein, each Defendant knowingly benefitted by receiving revenue and other benefits from its participation in a continuing business venture the Defendants knew or should have known was in violation of the TVPRA.

235. Each of the Defendants is liable to Plaintiff under the TVRPA because they have all benefited and conspired to benefit from a continuing business venture in which Plaintiff and other trafficking victims were coerced and threatened into provided free forced labor in violation of U.S.C. § 1589.

236. Each Defendant, through the acts and omissions more fully described herein, received a financial benefit from participating in a business relationship in which they recruited, exploited, and manipulated vulnerable kids from desperate families around the country, including Plaintiff.

## COUNT FIVE

**(Beneficiary Liability under §1595 (a) of the TVPRA for Violations of 18 U.S.C. § 1590)**

**(Against all Defendants)**

237. Plaintiff realleges and incorporates every allegation of this Complaint as if each

44

were set forth fully and completely herein.

238.    The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

239.    Defendants all benefited from a venture in which Plaintiff was recruited, transported, and housed for forced labor in violation of 18 U.S.C. § 1590.

240.    Under 18 U.S.C. § 1590(a), it is unlawful to "knowingly recruit, harbor, transport, provide, or obtain by any means, any person for labor or services in violation of this chapter."

241.    Defendants violated 18 U.S.C. § 1590 in several ways, including but not limited to the following:

    a.  Creating and disseminating misleading marketing materials to describe Defendants' services and programs as legitimate therapeutic entities with specialized and industry leading expertise in treating teens and young adults, like R.B., with mental healthcare issues;

    b.  Making misrepresentations regarding living conditions, never warning R.B. or other survivors that Defendants would withhold basic hygiene and living necessities as punishment for alleged behavioral infractions, including refusing to work;

    c.  Misrepresenting to Plaintiff and other survivors that the forced labor for which they had been recruited to Defendants' programs was "volunteer" work when in fact it was forced and required labor;

    d.  Specifically targeting vulnerable and struggling teens and their desperate families;

    e.  Expressly marketing and recruiting prospective residents, including R.B., with promises of therapeutic services when in fact they received little to no actual

45

therapy, and in fact, spent more time engaged in forced labor than they did in therapy;

f.   Housing R.B. and other survivors at all relevant tiems during which all violations occurred;

g.   Transporting R.B. and other survivors to weekly forced labor sites;

h.   Controlling all aspects of R.B.'s housing, transportation, and access to food and water during all relevant times during which all violations occurred.

242.   The Defendants operate with one common and shared financial interest, which is to profit from their shared facilities and programs.

243.   The profit from Trails Carolina and AAG is shared with the named Defendant controlling and managing entities, which in turn is shared with the litany of private investors and equity groups.

244.   Trails Carolina and AAG increased profits, and thus shared more profit with the other Defendants, through the labor trafficking alleged herein.

245.   As a result of their shared financial interest and the corporate and structural cohesion and control as described herein, all Defendants invariably profited from the labor trafficking of R.B

246.   All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, in ways further described herein, each Defendant knowingly benefitted by receiving revenue and other benefits from its participation in a continuing business venture the Defendants knew or should have known was in violation of the TVPRA.

247.   Each of the Defendants is liable to Plaintiff under the TVRPA because they have all benefited and conspired to benefit from a continuing business venture in which Plaintiff and other trafficking victims were coerced and threatened into provided free forced labor in violation of  U.S.C. § 1590.

248.   Each Defendant, through the acts and omissions more fully described herein,

46

received a financial benefit from participating in a business relationship in which they recruited, vulnerable kids from desperate families around the country, including Plaintiff, housed them, and then transported them to and from forced labor sites.

## COUNT SIX

### Violations of NC UDTPA, N.C.G.S. § 75-1.1 *et seq.*

### (Against All Defendants)

249.    Plaintiff realleges and incorporates every allegation of this Complaint as if each were set forth fully and completely herein.

250.    Defendants engaged in numerous unfair acts that were immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff, and other consumers.

251.    Defendants had knowledge and advantage that consumers do not about its businesses, both prior to parents choosing to trust their children and young adults, including Plaintiff, to their custody and care, and while Defendants had exclusive custody and care over its residents. Defendants' unfair acts include, without limitation, the following:

   a.  By mischaracterizing and intentionally withholding the risk profile of children and young adults they admit into its program and the risk of sexual misconduct being committed upon its residents, including Plaintiff;

   b.  Defendants fail to disclose that they accept residents who have been physical and/or sexually abused or have committed sexual abuse themselves, or had substance abuse issues, and that some of those residents later become staff;

   c.  by characterizing its staff as experienced and expertly trained with decades of experience, when for the most part, children and young adults interact with young field staff who are only required to have GED, are not trained or licensed to provide any mental health service, and who are not adequately trained or supervised by Defendants.

   d.  by withholding from parents and residents, including Plaintiff, the true risks of abuse in its program;

47

e.  by withholding from parents and residents, including Plaintiff, timely information about children and young adults suffering assault and battery while in Trails' custody and care;

f.  by publishing misleading statistics on its website that overstates the positive outcomes for residents enrolled in its program;

g.  by calling enrollees "students" when Plaintiff and other residents had very little schooling and received no academic credit for their time at Defendants' programs.

h.  by failing to make to criminal reports in order to avoid public scrutiny into its business operations;

i.  by failing to take the necessary steps in its business operations to prevent and promptly intervene in incidents of sexual assault and battery, including choosing to admit and retain staff and students with a history of sexual misconduct and failing to provide adequate training and supervision of its employees; and

j.  and in such other ways as will be revealed in the course of discovery in this case.

252.    As the direct result of the foregoing unfair business practices and the immoral, unethical and unscrupulous manner that Defendants' conduct its business, Plaintiff was substantially injured, and they hereby seek relief in excess of $75,000.00, exclusive of interest and costs.

## COUNT SEVEN

**Violation of Oregon Unlawful Trade Practices Act, Or. Rev. Stat. 646.608, *et seq.***
**(Against Defendants FHW/WTC, WTC HOLDCO, LLC, AND WTCSCL, LLC)**
**(collectively, the "Oregon Defendants")**

253.    Plaintiff realleges and incorporates every allegation of this Complaint as if each were set forth fully and completely herein.

254.    The Oregon Defendants acted willfully, and as a result of their misrepresentations and failures to disclose, R.B. suffered ascertainable loss of money.

255.     R.B. is entitled to a refund, together with interest. ORS 646.636.

256.    As the direct result of the foregoing unfair business practices and the immoral,

48

unethical and unscrupulous manner that the Oregon Defendants conduct their business, Plaintiff was substantially injured, and he hereby seeks relief in excess of $75,000.00, exclusive of interest and costs.

**PRAYER FOR RELIEF**

WHEREFORE: Plaintiff R.B. requests judgment against Defendants individually and jointly, for damages for all injuries and losses recoverable, including but not limited to:

A) Award R.B. all available damages, including, but not limited to Compensatory and Punitive Damages;

B) Award R.B. reasonable costs, restitution, attorneys' fees pursuant to 18 U.S.C. § 1595;

C) Award R.B. costs and expenses incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure

D) Award R.B. pre- and post-judgment interest in an amount according to the proof at trial; and

E) Grant R.B any further relief the Court may deem just and proper.

## N.C. Rule of Civil Procedure 9(j)

Plaintiff asserts that Federal Rules of Civil Procedure preempt Rule 9(j) of the North Carolina Rules of Civil Procedure, and therefore Rule 9(j) is not applicable in this case. If it is applicable, Plaintiff asserts that Rule 9(j) is unconstitutional as applied here. Under the circumstances of this case, application of Rule 9(j) is not appropriate because the misconduct giving rise to this action is not medical malpractice. Moreover, application of Rule 9(j) would effectively require plaintiff to prove her case before factual discovery is even begun, violate her rights of due process of law and equal protection under the law, violate her right to open courts, violate er right to a jury trial, violate the separation of powers, and confer an exclusive emolument on health care providers, in violation of the United States and North Carolina constitutions.

Under the circumstances of this case, application of Rule 9(j) would violate Plaintiff's rights under the Seventh and Fourteenth Amendments of the United States Constitution, and

Article I, sections 6, 18, 19, 25 and 32 and Article IV, sections 1 and 13 of the North Carolina Constitution. Accordingly, Plaintiff objects to the application of Rule 9(j) in this case. Without waiving her objection, counsel for Plaintiff provides the following information to comply with the requirements of Rule 9(j): the care rendered by Defendants and all medical records pertaining to the alleged negligence that are available to Plaintiff after reasonable inquiry have been reviewed before the filing of this complaint by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence and who is willing to testify that the care provided by defendants did not comply with the applicable standard of care.

If the Court later determines that Plaintiff's 9(j) expert does not meet the requirements of Rule 702(b) or Rule 702(c), Plaintiff will seek to have that person qualified as an expert witness by motion under Rule 702(e) of the Rules of Evidence, and Plaintiff hereby moves the Court, pursuant to Rule 9(j)(2), to so qualify that person.

WHEREFORE, Plaintiff demands:

a. That Plaintiff have and recover of Defendants, jointly and severally, a sum in excess of $75,000 in compensatory damages, plus interest from the date the suit was instituted, as provided by law;

b. To the extent necessary, Plaintiff hereby moves to have the 9(j) experts qualified under Rule 702(e) of the North Carolina Rules of Evidence;

c. That the costs of this action be taxed against Defendants, including attorneys' fees; and

d. For such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial regarding all triable claims.

50

Dated: June 20, 2025

RESPECTFULLY SUBMITTED,

/s/ *Joel R. Rhine*
RHINE LAW FIRM, P.C.
Joel R. Rhine, NCSB 16028
Email: jrr@rhinelawfirm.com
Ruth A. Sheehan, NCSB 48069
Email: ras@rhinelawfirm.com
1612 Military Cutoff Road, Suite 300
Wilmington, NC 28403
Tel: (910) 772-9960
Fax: (910) 772-9062

And

/s/ *Kimberly Dougherty*
Kimberly A. Dougherty, Esq.
*(pending pro hac vice admission)*
Keith E. Smith, Esq.
(*pending pro hac vice admission*)
JUSTICE LAW COLLABORATIVE
210 Washington St.
North Easton, MA 0256
(508) 230-2700
kim@justicelc.com
keith@justicelc.com

51