# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

**TRAILS CAROLINA, LLC**

      Third-Party Plaintiff,

      vs.

**GUY D. BURNEY AND KAREN STOUDENMIRE BURNEY,**

      Third-Party Defendants.

Civil Action No: 1:25-cv-00187-MOC-SCR

**MEMORANDUM IN SUPPORT OF THIRD-PARTY DEFENDANTS GUY D. BURNEY AND KAREN STOUDENMIRE BURNEY'S MOTION TO DISMISS THIRD-PARTY COMPLAINT**

Defendant Trails Carolina, LLC's ("Trails") Third-Party Complaint represents an attempt to force Guy D. Burney and Karen Stoudenmire Burney (the "Burneys") to pay for Trails' own abuse and neglect of the Burneys' daughter. The Burneys paid Trails approximately $425 per day for over 70 days, relying on Trails' representations that it possessed expertise in adolescent mental health and would help their daughter R.B., and their family, heal. Instead, Trails subjected R.B. to sexual assault, physical abuse, severe food restriction, humiliation, and forced labor from her first day in its custody. The North Carolina Department of Health and Human Services ultimately suspended admissions at Trails, then revoked its license, citing patterns of abuse, neglect, and exploitation.

Now Trails seeks to weaponize the trust the Burneys placed in it by forcing them to fund Trails' defense and indemnify any judgment R.B. obtains. Trails' claims fail on multiple independent grounds, including but not limited to: the indemnity agreement is unconscionable

under North Carolina law; common law indemnification requires joint liability that cannot exist here; and statutory contribution is barred by Trails' denial of negligence, its breach of fiduciary duty to R.B., and its intentional acts. Each ground independently warrants dismissal with prejudice.

## I. FACTUAL BACKGROUND

This case arises out of R.B.'s attendance at Trails for over 70 days, followed by attendance at the Asheville Academy for Girls ("AAG"), and their abuse and neglect of her in these programs. Trails was admittedly a for-profit therapeutic wilderness center for teens before it closed in 2024 following student deaths. Jane Doe R.B., Complaint and Jury Demand, Doc. 1 "R.B. Compl." at ¶ 3; ECF No. 18 at pg. 2, ¶ 3. Trails was part of a broad network of for-profit teen and young adult treatment facilities. R.B. Compl. ¶¶ 2-10. A litany of individual investors and equity groups control the for-profit treatment network. *Id.* at ¶ 10. Family Help & Wellness ("FHW") marketed Trails and AAG under its umbrella of related facilities. *Id.* at ¶ 27. The LLC that controlled Trails and AAG also manages FHW. *Id.* at ¶¶ 4, 6. Against this sophisticated, multi-layered corporate entity stood the Burneys, desperate to find help for R.B. *Id.* at ¶ 110.

R.B. was only 14 when she enrolled at Trails. *Id.* at pg. 2. The Burneys are individuals. ECF No. 18 at pg. 29, ¶ 3. As her parents, the Burneys were involved in the decision for R.B. to ultimately attend Trails, and they completed Trails' intake paperwork on her behalf. *See, e.g.*, R.B. Compl. ¶¶ 77, 87, 109, 110-116; ECF No. 18-1 at pg. 6. When they turned to Trails, the Burneys were desperate to help R.B. find solutions for her mental health struggles. R.B. Compl. ¶ 110. In making the decision to enroll R.B. at Trails and then AAG, the Burneys relied wholly on the consistent representations of Trails, its corporate parents, and AAG about their collective expertise in adolescent mental healthcare and their ability to help R.B. *Id*. at ¶ 115.

FHW admittedly marketed Trails and AAG as "program partners" that were "leading experts in adolescent behavioral health," which would deliver "outstanding care and outcomes."

R.B. Compl. at ¶ 37; ECF No. 18 at pg. 7, ¶ 37. FHW marketed Trails and AAG as integrated services, such that R.B. would leave Trails and go right into AAG. R.B. Compl. ¶¶ 35-36. Trails even offered R.B. and the Burneys a discount for the package of Trails and AAG. *Id.* at ¶ 143. In fact, the Burneys listed the staff of AAG as a provider that referred R.B. to Trails. *See* Exhibit A, R.B. Consent for Release of Information.[1]

Trails admittedly marketed itself as being founded on "decades of experience and scientific research," and that it provided "outstanding care and outcomes." R.B. Compl. ¶¶ 37, 82-83; ECF No. 18, pg. 7, 12, ¶¶ 37, 82-83. Trails, AAG, and FHW all emphasized the role of the family in the student's recovery, statements that contradict Trails' Third-Party Complaint. R.B. Compl. ¶¶ 34, 51-52, 84. AAG admittedly marketed that it wanted "each family to reach success and meaningful change" and that it would "strive to work through each individual student's issues with the involvement of the whole family." R.B. Compl. ¶ 52; ECF No. 18, pg. 8, at ¶ 52. Trails' CEO admittedly described the facility as offering services with "[y]our family's team" that includes a "family therapist." R.B. Compl. ¶ 84; ECF No. 18, pg. 12, at ¶ 84. FHW admittedly marketed that it served "the varying needs of families" and that "FHW program partners provide the answers **our** families are seeking." R.B. Compl. at ¶¶ 33-34; ECF No. 18, pg. 6, at ¶¶ 33-34. The Burneys relied on these representations of family wellness, certainly from a company named "Family Help & Wellness." R.B. Compl. at ¶¶ 57, 111-112, 115.

At no point did Trails, AAG, or FHW ever warn the Burneys that Trails and AAG had a history of abusing and neglecting students or that R.B. would be abused and neglected at both facilities. *Id*. at ¶¶ 59, 65, 76-77, 109, 177. The Burneys ultimately decided to enroll R.B. at Trails

---

[1] Exhibit A is a Consent form taken from R.B.'s full Trails Enrollment Packet, of which Defendants ECF No. 18-1 is the first document. Exhibit A is pg. 10 (bottom right corner) of the full enrollment packet. Defendants' Exhibit A, ECF No. 18-1, is pgs. 2-7. The Consent states the Burneys "authorize Trails to release any and all information to the referral sources listed on this application." The Burneys listed AAG and a number of R.B.'s local providers on the Consent.

based on Trails, AAG, and FHW's direct representations of expertise in adolescent and family wellness. *Id*. at ¶¶ 57, 111, 115.

Importantly, Trails controlled its own intake process and had every opportunity to discover any information it now claims the Burneys failed to disclose. ECF No. 18-1 at pg. 1, ¶ 2. Trails admits that it required the Burneys to sign the Enrollment agreement "as a condition of Plaintiff's enrollment." ECF No. 18 at pg. 29, ¶ 8; *see also*, ECF No. 18-1 at pg. 1, ¶ 2 (Parent "must submit to Trails" a "completed and executed copy of the [Enrollment Agreement] before Trails would "conditionally accept" R.B. for enrollment.) Trails required the Burneys to comply with Trails' "information requests" and to provide it with consents and authorizations during the pre-enrollment period. *Id*. Trails would only admit R.B. after conducting a "personal evaluation and screening process" to determine if R.B. "satisfie[d] Trails' screening criteria …" *Id.* Trails thus had full control over (and responsibility for) gathering whatever information it deemed necessary before accepting R.B. into its program.

Trails abused and neglected R.B. from day one. R.B. Compl. ¶¶ 117-120. First, Trails strip searched her in a dark closet with no witnesses present. *Id.* at ¶ 117. Trails then violently restrained her in what it commonly referred to as a "burrito hold," which amounted to forcibly wrapping her in a sleeping bag, covering it with a tarp, then forcing her to remain compressed and wrapped like that, terrified that she might die, for her entire first night at Trails. *Id.* at ¶¶ 118-120. This same burrito hold led to the death of a 12-year-old student during his first night at Trails, which North Carolina's Department of Health and Human Services determined was a homicide. *Id.* at ¶¶ 100-104.

Over the next 77 days, Trails humiliated R.B., limited her ability to speak, severely restricted her food, forced her to wear a diaper and march in wet clothes in freezing rain, and forced her to perform unpaid labor such as industrial cleaning, cooking, and carrying camping equipment.

4

*Id.* at ¶¶ 122-140. While doing all of this, Trails limited and manipulated R.B.'s communication with the Burneys and her ability to report her abuse to anyone else. *Id.* at ¶¶ 141, 229(c).

Trails assumed exclusive custody of R.B. "[o]n the date [R.B.] physically arrive[d] at Trails." ECF No. 18-1, pg. 1, ¶ 3. R.B. suffered severe and distinct injuries while under Trails' exclusive control. *Id.* at ¶¶ 167-175. She now has PTSD symptoms that have been related back to the trauma she endured at Trails, and then later AAG. *Id.* at ¶ 170. She developed an eating disorder at Trails, with which she still struggles. *Id.* at ¶ 171. She also developed a substance abuse problem because of Trails' and AAG's abuse. *Id.* at ¶ 173. Throughout her time at Trails, then later at AAG, staff at both facilities told R.B. her worsening symptoms were her fault, and that their abuse of her was necessary for her to heal. *Id.* at ¶¶ 181-183. As a result of Trails' profound breach of the trust R.B. placed in it, she now struggles to obtain the care she desperately needs. *Id.* at ¶ 175.

## II.     LEGAL STANDARD

The Burneys move the Court to dismiss Trails' Complaint under Fed. Rule Civ. Proc. 12(b)(6). A Rule 12(b)(6) motion tests the legal sufficiency of the Complaint. *Papasan v. Allain*, 478 U.S. 265, 283 (1986). A Complaint must allege enough facts to state a claim for relief that is facially plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Facial plausibility means that the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and mere recitals of the elements of a cause of action supported by conclusory statements do not suffice. *Id.* The well-pled factual allegations must move a claim from conceivable to plausible. *Twombly*, 550 U.S. at 570. If it appears that a plaintiff is not entitled to relief under the stated facts, dismissal is proper. *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991)

5

## III. ARGUMENT

### A. The Contractual Indemnity Claim Should Be Dismissed Because the Indemnity Agreement is Unconscionable

Trails' claim for contractual indemnity should be dismissed because the Indemnity Agreement is unconscionable. The Indemnity Agreement was a required "heads-I-win-tails-you-lose" contract in which the trusting Burney family gave up everything to the private-equity funded Trails – and got nothing in return. The Indemnity Agreement is accordingly an overbroad adhesive contract that is both substantively and procedurally unconscionable.

Procedural unconscionability is found where there is "bargaining naughtiness in the form of unfair surprise, lack of meaningful choice, and an inequality of bargaining power" *Tillman v. Commercial Credit Loans, Inc.*, 362 N.C. 93, 102 (2008) (quoting, *Rite Color Chemical Co. v. Velvet Textile Co.*, N.C. App. 14, 20 (1992)). On the other hand, substantive unconscionability will be found when there are "harsh, one-sided, and oppressive contract terms." *Tillman*, 362 N.C. at 103.

In determining whether the Indemnity Agreement is unconscionable, the Court's "substantive/procedural analysis is more of a sliding scale than a true dichotomy." *Id.* at 103. In other words, "[t]he harsher the clause, the less 'bargaining naughtiness' that is required to establish unconscionability." *Id*. The ultimate question that is affirmatively answered here is whether the "terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." *Id.*

To allow Trails to enforce the harsh Indemnity Agreement would force the Burneys, and any other unsuspecting parent who signed a similar agreement with Trails and files a case in this jurisdiction, to pay the legal costs of their child's abuser. This would be profound and shocking such that "no decent, fairminded person would view the ensuing result without being possessed of

6

a profound sense of injustice…" *Blaylock Grading Co., LLP v. Smith*, 189 N.C. App. 508, 511 (NC. App. 2008)(quoting, *Gas House, Inc. v. Southern Bell Tel. & Tel. Co.*, 289 N.C. 175, 182 (1976). The Court should dismiss Trails' claim for contractual indemnity with prejudice.

      **1.   The Indemnity Agreement is Substantively Unconscionable Because It Is Harsh, One-Sided, and Violates North Carolina Public Policy**

The Indemnity Agreement is substantively unconscionable for at least four reasons. First, it is harshly one-sided with unlimited scope. Second, it operates as an illegal waiver of both R.B.'s rights and Trails' duties, violating North Carolina public policy. Third, it weaponizes family relationships by forcing victims to choose between justice and family ruin – directly contradicting Trails' therapeutic promises. And fourth, it improperly shifts federal statutory remedies from a corporate tortfeasor to individual parents of the victim. Together, these factors demonstrate extreme substantive unfairness.

      a.   *The Agreement is Completely One-Sided with Unlimited Scope*

With the Indemnity Agreement, the Burneys gave up all rights, assumed unlimited financial liability, and received nothing in return. The lopsided waiver provision required the Burneys to preemptively release Trails, and everyone imaginable who could be affiliated with Trails—including peripheral entities like "insurers," "attorneys," "community organizations" and even "related or affiliated business entities…"—none of whom are signatories to the agreement, or even named in it. ECF No. 18-1, at pg. 3, ¶ 7.

As to the laundry list of released parties, the Enrollment Agreement uses expansive language to include all possible claims. It purports to require the Burneys to "release, in advance, and to waive…any and all claims for damages for death, personal injury…" that arise "through negligence, carelessness or any other cause…" *Id.* It specifically contracts away Trails' "breach of any duty owed to" the Burneys or R.B. – a minor in Trails' custody. *Id.* There is no limitation

whatsoever on who or what is being released. Any entity, i.e., "related or affiliated business entity," with even a tangential connection to Trails could claim protection under this provision, despite never being identified to the Burneys. *Id.*

The language of the Indemnity Agreement is even more expansive and attempts to cover any conceivable liabilities Trails might incur because of R.B., to include all of her claims and claims brought by other parties that "relate to" her time a Trails, to include:

> "actions, causes of action, claims, demands, damages, costs (including attorneys' fees), expenses, liabilities and charges, known or unknown…arising out of or in connection with claims and/or actions relating to or brought by or on behalf of Student, including, **without limitation**, claims related to or arising out of the Student's participation in the Program."

ECF. 18-1, at pg. 3, ¶ 7 (emphasis added).

The breadth is staggering. There is no limitation to the Burney's financial exposure and no limitation to what they released. Under this language, if another student injured R.B., and she sued Trails for failing to protect her, the Burneys would have to pay. If a staff member drove drunk and got in an accident with R.B. in the car, the Burneys would have to pay. If R.B. had died in the burrito hold Trails put her in on her first night—as another student did in 2024—the Burneys would have to pay. Compl. at ¶¶ 100-103.

The Burneys would also pay for indirect claims, such as R.B. being a purported member of a class action against Trails, or if the State fined Trails for violations uncovered during R.B.'s stay. The effect, evidenced by Trails' Complaint, is that Trails does what it wants, without liability, and the Burneys, or other unsuspecting parents, pay everything.

Indeed, the Burneys already paid $425 per day while R.B. was at Trails. ECF No. 18-1 at pg. 2, ¶ 4(c). R.B. did not receive what Trails promised. Compl.. at ¶¶ 124-142. Rather, the Burneys bought abuse for their daughter and unlimited financial liability for themselves. There was no consideration in return for this extreme financial exposure and preemptive release of all rights. No

reasonable facility that was sincerely interested in healing families would insist on such an abusive clause in a boilerplate contract.

b. *The Agreement Violates Multiple Public Policies*

Beyond its unconscionable scope, the Indemnity Agreement violates multiple aspects of North Carolina public policy. First, the Burneys could not waive R.B.'s claims because she was a minor when the Burneys signed the Agreement. *See Creech v. Melnik*, 147 N.C. App. 471, 478 (N.C. App. 2001) (finding that it was "well established in North Carolina that a covenant not to sue negotiated for a minor is invalid without investigation and approval by the trial court."). *Id.* R.B.'s claims against Trails are therefore valid, despite any purported waiver of them in the Enrollment Agreement.

Second, Trails cannot contract away its own negligence because to do so would violate North Carolina public policy. *Alston v. Monk,* 92 N.C. App. 59, 64, 373 S.E.2d 463, 466 (1988), *disc. review denied*, 324 N.C. 246, 378 S.E.2d 420 (1989). Providing residential mental health services to children is "extensively regulated to protect the public from danger" and "it would violate public policy to allow those engaged in such an activity to absolve themselves from the duty to use reasonable care." *McMurray v. United States*, 551 Fed. Appx. 651, 655 (4th Cir. 2014)(quoting, *Forston* v. *McClellan*, 131 N.C. App. 635, 637 (1998). Trails cannot absolve itself from its duty of reasonable care, yet that is precisely what it attempts here through forcing the Burneys to indemnify its negligence. *McMurray,* 551 Fed. Appx. at 653 (quoting, *Hall v. Sinclair Refining Co.*, S.E. 2d 396, 398 (N.C. 1955) (noting exculpatory contracts are unenforceable when "violative of some rule of public policy" or where parties have "unequal bargaining power")

Third, Trails cannot contract away liability for intentional acts. North Carolina prohibits waiver and indemnification for intentional conduct. *See, e.g., Ada Liss Group v. Sara Lee Corp.*, 2010 U.S. Dist. LEXIS 59691, 28 (M.D.N.C. 2010) ("The precedent created if contracts with

9

exculpatory clauses for intentional torts became enforceable would be noxious."); *Graham v. James F. Jackson Associates, Inc.*, 84 N.C. App. 427, 432 (1987) ("It is a general rule that an insurance policy is void as against public policy if its intent is to indemnify the insured against liability for his own criminal acts."). R.B.'s alleges several intentional acts that Trails cannot push onto the Burneys. R.B. Compl. ¶ 117 (sexual assault); ¶¶ 118-119 (physical assault); ¶¶ 138-140 (forced labor).

Finally, the Indemnity Agreement discourages abuse reporting. North Carolina requires all adults to report suspected child abuse, with criminal penalties for failure to report. N.C. Gen. Stat. § 7B-301. Yet under the Indemnity Agreement, if anyone—the Burneys, R.B., even a Trails employee—reported R.B.'s abuse to the authorities, Trails could force the Burneys to pay all resulting costs and fines as "relating to" R.B. ECF No. 18-1, at 3, ¶ 7.

For example, if someone reported R.B.'s abuse to the State, Trails could make the Burneys pay its related costs if the State brought an "action" "relating to" R.B. [2] *Id.* This perverse incentive protects abusers while punishing victims and their families, directly contradicting North Carolina's expansive reporting policy.

### c. *Trails is Weaponizing the Family Relationship it Promised to Restore*

The Indemnity Agreement also weaponizes family relationships by forcing victims, like R.B., who were minors when they enrolled at Trails to later choose between justice and family financial ruin. This directly contradicts Trails' extensive marketing promises of family healing.

Trails' marketing and representations to the Burneys are important considerations because "[i]n determining whether a contract is unconscionable, a court must consider all the facts and circumstances of a particular case." *Brenner v. Little Red School House, Ltd.*, 302 N.C. 207, 213

---

[2] The indemnity would fail as a matter of law, but Trails could force unsuspecting parents, like the Burneys, to hire counsel to defend against its baseless causes of action.

(1987) Here, Defendants admit that FHW stated on its website that Trails and its other partners "offer a spectrum of treatment options that serve the varying needs of families." R.B. Compl. ¶ 33; ECF No. 18 at pg. 6, ¶ 33. AAG, which Trails marketed as an integrated component of its program to the Burneys, admittedly stated on its website that "each family [would] reach success and meaningful change" through addressing issues "with the involvement of the whole family." R.B. Compl. ¶ 52; ECF No. 18 at pg. 8, ¶ 52. Indeed, Trails' corporate parent, and co-defendant in this case, is named "Family Help & Wellness." R.B. Compl. ¶ 6. Based on these representations, the Burneys toured AAG, and decided to enroll R.B. at Trails based on these and other representations. R.B. Compl. ¶¶ 112-116.

The cynical duplicity of Trails' scheme is exposed within the very contract the Burneys signed. Just a few paragraphs after the Indemnity Agreement, Trails included a provision that required the Burneys to "maximize the benefits of the Program" through cooperating with Trails, reading Trails' materials, and attending Trails' seminars. ECF 18-1, at pg. 5, ¶ 15. Yet paragraphs away, the Indemnity Agreement transforms this mandated family cooperation into a weapon that tears families apart. *Id*. at pg. 3, ¶ 7.

R.B. must now endure more trauma and choose between obtaining justice and destroying her parents financially. This is an impossible choice that no genuinely therapeutic facility should ever impose on a client. *See Estates of Morgan v. Fairfield Family Counseling Center*, 77 Ohio St.3d 294, 290 (1997) (recognizing special vulnerability of patients in therapeutic relationships and heightened duties owed). Trails cannot have it both ways. It cannot brand itself as an expert in family healing, promise the Burneys that same level of family healing, mandate their cooperation and attendance as essential to treatment, then force them to bear the cost of Trails' abuse of R.B. This itself is abusive trauma, and it epitomizes substantive unconscionability because no reasonable person would ever knowingly agree to it, and no honest facility would ever require it.

d. *The Indemnity Agreement Unlawfully Shifts Statutory Remedies*

The Indemnity Agreement attempts to accomplish what federal law discourages: shifting liability for trafficking violations from the perpetrator to the victim's family. R.B. alleges Trails violated the TVPRA by forcing her to perform unpaid labor. R.B. Compl. at ¶¶ 209-248. The TVPRA provides trafficking survivors with a federal civil remedy against only the perpetrator of their abuse and/or whoever knowing benefits from their exploitation. 18 U.S.C. 1595(a).

This Circuit has not examined whether a mental health facility that used forced labor to punish a minor can shift its TVPRA liability onto the child's parents. While there are cases in other jurisdictions that have allowed contractual indemnity claims to proceed as between corporate defendants facing TVPRA claims, such as a hotel franchisee and franchisor, those cases involved allegations of the indemnitors benefiting from the trafficking. *See, e.g. C.D. v. Red Roof Inns, Inc.*, 2024 U.S. Dist. LEXIS 237690, at * 16-17 (N.D. Ga. 2024 (quoting *A.B. v. Marriott Int'l, Inc.*, 2020 U.S. Dist. LEXIS 117728, at *5 (E.D. Pa. 2020) (allowing hotel chain to file indemnity claim against franchisee because franchisee may have benefited from the trafficking); *see also Doe v. Red Roof Inns,* 21 F.4th 714, 723 (11th Cir. 2021) (discussing remedial purpose of TVPRA civil remedy). Trails does not allege the Burneys benefitted from R.B.'s forced labor at Trails. To the contrary, the Burneys paid Trails substantial sums for services Trails failed to provide, while Trails extracted free labor from their daughter that should have been performed by paid staff.

In a similar context, this Court has already held that a corporation cannot use indemnification agreements to push its liability under a federal remedial statute onto an individual. In *Lowe's Cos. V. Varnell, Struck & Assocs.,* this Court recognized that forcing employees to indemnify FLSA violations would "gut the remedial nature of the FLSA." 2008 U.S. Dist. LEXIS 108144, * 25-26 (W.D.N.C. 2008) (noting that "[c]ourts have consistently held that

12

indemnification violates public policy where the employee or employee funds are the sources of indemnification.") [3] Trails seeks to do nearly that by funding its TVPRA liability to R.B. through the Burneys.

The TVPRA context makes indemnification here even more offensive than in employment cases. There, an adult who has some bargaining power during their employment process and does not have to sign the agreement, still cannot indemnify the corporate employer's wage violations. Here, R.B. was a minor when the Burneys signed her enrollment paperwork. She had no bargaining power or voice in the transaction, yet she is being forced to push Trails' TVPRA liability onto the Burneys.

The resulting economic absurdity is stark. The Burneys paid $425 per day for R.B. to attend Trails. ECF 18-1 at pg. 2, ¶ 4(c). Rather than help R.B., Trails forced her to perform unpaid labor that should have been done by paid staff.  R.B. Compl. at ¶ 166; 138-140. Now Trails wants the Burneys to pay again. This is triple extortion: payment for services not provided, extraction of free labor from their child, then indemnification for that exploitation. Enforcing the Indemnity Agreement would not just "gut the remedial nature" of the TVPRA, it would transform a statute designed to help survivors into one that bankrupts their families. *Lowe's Cos.*, 2008 U.S. Dist. LEXIS 108144, * 25-26.

## 2.  The Indemnity Agreement is Procedurally Unconscionable

The Indemnity Agreement is also procedurally unconscionable. Like the *Tillman* corporate defendant's mandatory agreement, Trails admits it required the Enrollment Agreement "as a condition of Plaintiff's enrollment." Doc. 18 at 29; *see also*, ECF 18-1 at pg. 1, ¶ 1 (Parents "must

---

[3] While *Lowe's* noted that ordinary third-party indemnification of FLSA claims between commercial entities might be permissible, this case presents the extraordinary situation of forcing a child to effectively sue her parents, notably different from the commercial risk-shifting of two corporate entities agreeing to indemnify, and far more akin to a corporation forcing an individual employee to cover its costs.

submit to Trails" a "completed and executed copy of the [Enrollment Agreement] before Trails would "conditionally accept" R.B. for enrollment.) This admission establishes the Enrollment Agreement as an adhesion contract that Trails presented on a take-it-or-leave-it basis.

The disparity in bargaining power was extreme. Trails is part of a private-equity backed corporate conglomerate that oversees multiple other facilities. R.B. Compl. at ¶¶ 2-11. The Burneys relied wholly on Trails and the other Defendants' representations about Trails' services and their ability to help R.B. *Id.* at ¶¶ 110-116. Like the "unsophisticated consumers contracting with corporate defendants" in *Tillman*, the Burneys were faced with the same type of adhesive boilerplate agreement. 362 N.C. at 103.

The Burneys had no meaningful choice. Based on Trails' representations, the Burneys believed Trails was uniquely qualified to help R.B. R.B. Compl. ¶¶ 34, 37-39, 80-82. The Burneys were desperate to find R.B. help. *Id.* at ¶ 110. They faced the binary decision of signing the Enrollment Agreement or denying R.B. access to what they believed was her only hope for healing.

Moreover, the Indemnification Agreement constitutes unfair surprise. Nothing in Trails' extensive marketing would alert reasonable parents that buried in the enrollment paperwork was a provision requiring them to pay all costs for their daughter's abuse, and any conceivable claims related to it. Rather, Trails and Family Help & Wellness promised to "provide the answers <u>our</u> families are seeking" and emphasized its "passion for helping families." R.B. Compl. ¶¶ 33-39, 52 (emphasis added). Abusing a child and then forcing her parents to pay the settlement, costs, and attorneys' fees is a far cry from helping families.

Under *Tillman's* "sliding scale" even minimal procedural unfairness can render a contract with extremely harsh terms unconscionable. *Tillman* 362 N.C. at 103 (N.C. 2008) (finding unconscionability appropriate when contracts present "pronounced substantive unfairness and a minimal degree of procedural unfairness.") Here, the procedural unfairness is far from minimal.

There was a vast bargaining disparity, a required adhesion contract, and complete unfair surprise. Combined with the extreme substantive unconscionability demonstrated above, the Agreement is unenforceable as a matter of law. The Court should dismiss Trails' Contractual Indemnity claim with prejudice.

**B.     The Common Law Indemnity Claim Fails as a Matter of Law**

Trails' cause of action for common law indemnification must be dismissed because it fails to plausibly establish either of the required elements for the claim. In North Carolina, common law indemnification requires both that Trails and the Burneys share joint and several liability to R.B. *and* either that Trails was passively negligent or that its liability is derivative to that of the Burneys. *Kaleel Builders, Inc. v. Ashby*, 161 N.C. App. 34, 41 (2003) (citing, *Edwards v. Hamill*. 262 N.C. 528, 138 (1964). Trails does not satisfy either element, and no amendment could cure this fundamental defect.

Trails' Third-Party Complaint rests on three conclusory and insufficient allegations: (1) the Burneys' decision to enroll R.B. at Trails was somehow negligent; (2) the Burneys failed to disclose unspecified "relevant information at the time of enrollment"; and (3) the Burneys failed to "appropriately supervise, direct, or inform" R.B. regarding Trails. ECF No. 18 at pgs. 31-32, ¶ 18. Every one of Trails' allegations was temporally severed the moment R.B. entered Trails and assumed custody of her. ECF No. 18-1 at pg. 1, ¶ 3.

To be sure, the Burneys dispute all three allegations. They relied wholly on the representations of Trails and the Defendants in deciding to enroll R.B. at Trails. R.B. Compl. ¶¶ 112-116. Trails, not the Burneys, was the "expert" in teen mental health, and conducted an intake and in person interview of R.B., and the Burneys, before her enrollment. Doc. 18-1 at pg. 1, ¶ 2; Compl. at ¶¶ 112-116. Whatever unspecified information the Burneys allegedly failed to disclose during Trails' extensive intake process could in no way supersede Trails' subsequent and systemic

abuse of R.B. Finally, the third allegation is repetitive of the first – whatever representations the Burneys made to R.B. were fully informed by what they received from Trails. R.B. Compl. at ¶ 115.

The reality here is as simple as it is tragic. Trails misrepresented its services to the Burneys. *See, e.g., Id.* at ¶¶ 33-44; 113-116. The Burneys relied on those misrepresentations and allowed Trails to take exclusive custody of R.B. for the express purpose of helping her. *Id.* at ¶¶ 110-116. Trails then abused R.B. for months while limiting her contact with the Burneys. *Id.* at ¶¶ 117-144. No plausible legal theory could transform these facts into parental liability.

Even accepting Trails' allegations as true, none of them, either alone or combined, establishes both requirements for common law indemnification for three reasons. First, the Burneys and Trails are not jointly and severally liable to R.B, Second, Trails was actively negligent. And third, Trails' liability is not derivative to the Burneys' alleged liability. The Court should dismiss this cause of action with prejudice.

### 1. The Burneys and Trails Are Not Jointly and Severally Liable to R.B.

The Burneys and Trails are not jointly and severally liable to R.B. Joint and several liability is allowed only when defendants create "a single indivisible injury." *Warren v. Colombo*, 93 N.C. App. 92, 104-105 (1989). An indivisible injury occurs when "(1) defendants have acted in concert to commit a wrong that caused an injury; or (2) defendants, even without acting in concert, have committed separate wrongs that still produced an indivisible injury." *GE Betz, Inc. v. Conrad*, 231 N.C. App. 214, 235 (2013). For there to be an indivisible injury, apportionment must be impossible, meaning the harms are not distinct. *Warren*, 93 N.C. App. at 104-105. Neither scenario exists here, and the Burneys' alleged harm is entirely distinct from Trails'.

The Burneys did not act in concert with Trails to harm their daughter. Indeed, the Burneys transferred custody to Trails when she arrived there. ECF No. 18 at pg. 1, ¶ 3. All of the Burneys'

alleged harm accordingly occurred before R.B.'s admission to Trails. ECF No. 18 at pgs. 31-32, ¶ 18. And Trails' abuse and neglect of R.B. occurred after her admission to Trails. *See, e.g.*, R.B. Compl. ¶¶ 117-142. The Burneys did not tell R.B. that Trails would abuse and neglect her, and they could never have known because Trails told the Burneys the complete opposite. *Id.* at ¶ 109.

A simple comparison of the allegations shows that separate acts did not combine to produce an indivisible injury. R.B.'s injuries stem from Trails' assault, abuse, forced labor, and institutional neglect, coercion, and humiliation. *Id.* at ¶¶ 117-142. This was all pattern and practice for Trails, and Trails never warned the Burneys. *Id.* at ¶¶ 87-109. Trails alleges the Burneys were somehow negligent in their enrollment of R.B. ECF No. 18 at pgs. 31-32, ¶ 18. These are not indivisible harms. *See Seigneur v. National Fitness Institute, Inc.*, 132 Md. App. 271, 312 (2000) (holding parent's decision to enroll child in program and facility's subsequent abuse were divisible harms capable of apportionment); *J.A.W. v. Roberts*, 627 N.E.2d 802, 807 (Ind. Ct. App. 1994) (parental decisions regarding placement distinct from facility's subsequent abuse).

Taking Trails' accusations as true, enrollment decisions and systematic institutional abuse are entirely distinct harms capable of clear apportionment. They are temporally severed and factually distinct. Trails cannot establish the indivisible injury required for joint and several liability. Moreover, even if the Burneys' enrollment decision could somehow constitute negligence, Trails' systemic abuse of R.B. represents an independent intervening cause that would sever any causal connection to the Burney's decision. *See Holtzman v. Roberson,* 357 N.C. 242, 248 (2003) (discussing superseding cause doctrine). This claim should be dismissed.

### 2. Trails Was Actively Negligent and Its Liability Is Not Derivative to the Burneys'

In addition to establishing joint and several liability, which it cannot do, Trails must plausibly allege that either (1) the Burneys were actively negligent or (2) that the Burneys alone

committed the harm and that Trails' liability is therefore derivative to the Burneys'. *Kaleel Builders, Inc.* 161 N.C. App. at 41 (citing *Edwards*, 262 N.C. at 138. Neither applies here.

Trails was actively negligent. Trails directly and exclusively committed every act that injured R.B. Trails' employees sexually assaulted R.B. on her first night at the facility. R.B. Compl. ¶ 117. That same night, its employees abused her by violently restraining her in a "burrito hold." *Id.* at ¶¶ 118-120. This is the same burrito hold that killed a Trails student in what North Carolina later determined was a homicide. *Id.* at ¶¶ 100-102. Trails actively controlled every decision R.B. made, including what she could wear, what and when she ate, and when she could speak to the Burneys. *Id.* at ¶ 122. Trails actively humiliated her by forcing her to read personal letters to peers, limited her speaking to three questions per day, and punished her when her anxiety predictably skyrocketed. *Id.* at ¶¶ 123-129. Trails restricted her food to such an extreme degree that she lost over 70 pounds in 77 days. *Id.* at ¶¶ 132-133. Trails forced her to hike through freezing rainstorms in wet clothes wearing a diaper. *Id.* at ¶¶ 134-137. And Trails forced her into unpaid labor—cooking, cleaning facilities, and hauling camping equipment. *Id.* at ¶¶ 138-140.

Against this litany of abuse, Trails contends it was *passively* negligent and that the Burneys' alleged enrollment decisions and disclosures were the active side of the coin. ECF No. 18, pgs. 31-32, ¶ 18. The Burneys are nowhere to be found in this 77-day horror of active and nightmarish abuse and neglect. In fact, Trails actively limited options for R.B. and other survivors to report concerns as they were happening. *Id.* at ¶ 141. No plausible amendment transforms the Burneys' enrollment decisions into "active" negligence while recasting Trails' 77 days of hands-on abuse and neglect as merely "passive."

Trails' liability is also not derivative to the Burneys'. This alternative prong permits indemnification only where "one alone has done the act which produced the injury but the other is derivatively liable for the negligence of the former." *Edwards*, 262 N.C. at 531. Indeed, "[t]he

party seeking indemnity must have imputed or derivative liability for the tortious conduct from which indemnity is sought." *Kaleel Builders, Inc*., 161 N.C. App. at 41. There is no reading of the live complaints in this action that could suggest the Burneys alone harmed R.B.

The relationship between the Burneys and Trails is not one of derivative liability, which commonly arises through a legal relationship, such as agent/principal, in which the principal does nothing but remains liable for acts done solely by its agents. *See, e.g., Yates v. New South Pizza, Ltd*., 330 N.C. 790 (N.C. 1992). Trails and the Burneys were not agents.

The Burneys transferred custody to Trails upon her admission. ECF No. 18-1 at pg. 1, ¶ 3. From that moment forward, Trails exercised exclusive control over R.B. and acted independently of the Burneys. No agency or derivative liability relationship existed. *See Reardon v. Wrightwood Manor,* 136 Cal.App.3d 1006, 1009 (1982) (facility's duty independent of family's placement decision); *Cowan v. Doering,* 111 N.J. 451, 462-63 (1988) (institutional liability not derivative of parental decisions.)

The legal impossibility of Trails' pleading becomes clear when considering what facts could plausibly support derivative liability. Trails would need to allege it is being held liable solely for the Burneys' acts, not its own conduct. This would require alleging the Burneys' enrollment decisions and intake paperwork, <u>alone</u>—not Trails' sexual assault, forced labor, or physical and mental abuse—caused R.B.'s injuries. The Burneys did not knowingly enroll R.B. at Trails for abuse and neglect. R.B. Compl. ¶ 109. No plausible legal theory recasts their enrollment decision as active negligence in the face of Trails' conduct. Trails' 77 days of neglect and abuse creates direct liability.

Trails cannot satisfy any element required for common law indemnity. Because no conceivable amendment could cure these fundamental defects, the Court should dismiss this cause of action with prejudice.

**C.     The Contribution Claim Must Be Dismissed Because It Fails Under Several Statutory Restrictions**

Trails' contribution claim is statutorily prohibited. The Uniform Contribution Among Tort-Feasors Act ("UCATFA") governs contribution claims in North Carolina. *See* N.C. Gen. Stat. § 1B-1. The UCATFA enumerates several exceptions that limit the general right to contribution, three of which apply here to foreclose Trails' claim. *Id*. First, by Trails' own admission, Trails and the Burneys are not joint tortfeasors as required for contribution. *Id.* at (a). Second, Trails cannot seek contribution because it breached its fiduciary duty to R.B. *Id*. at (g). And third, Trails' intentional acts against R.B. preclude its right to contribution from the Burneys. *Id*. at (c). Any one of these would independently warrant dismissal of Trails' contribution claim. Because all three are evident here, the Court should dismiss the claim with prejudice as no amendment could overcome all three statutory obstacles.

### 1.   The Burneys Are Not Joint Tortfeasors with Trails

Trails denies it was negligent. ECF No. 18 at 27, Fifth Affirmative Defense ("If it is determined that these answering Defendants were negligent, as alleged in Plaintiff's Complaint or otherwise, **which has been and is once again expressly denied**…") (emphasis added). Trails' contribution claim must be dismissed with prejudice because it denies that it was a joint tortfeasor with the Burneys. This denial alone is fatal to the contribution claim.

Moreover, Trails simply cannot meet its burden to allege circumstances tending to show liability to the injured party [R.B.] as well as a right to contribution." *Holland*, 324 N.C. at 470 (citing *Clemmons v. King*, 265 N.C. 199, 202 (1965). As noted above in section III.B.1., the Burneys did not act in concert with Trails. The Burneys relied on Trails' representations of expertise in deciding to enroll R.B., then entrusted her exclusively to Trails for 77 days. Compl.

¶¶ 110-116, 142. Trails abused R.B. from day one and continued to do so for 77 days without the Burneys' involvement. *Id*. at ¶¶ 117-120.

Nor did any separate acts unite to create an indivisible injury. The Burneys alleged harm is temporally limited to the intake process at Trails, that Trails controlled. Further, intake decisions are easily divisible from Trails later institutional abuse of R.B. These harms are temporally severed, factually distinct, and entirely apportionable.

There is no basis for contribution. Trails denies it was negligent, and there is no indivisible injury. Trails' contribution claim must be dismissed pursuant to N.C. Gen. Stat. § 1B-1(a).

## 2. Trails Cannot Seek Contribution Because It Breached Its Fiduciary Duty to R.B.

Trails cannot seek contribution from the Burneys because it breached its fiduciary duty to R.B. N.C. Gen. Stat. § 1B-1 (g) (Contribution "shall not apply to breaches of trust or of other fiduciary obligation.") Trails had a confidential relationship with R.B. and therefore owed her a fiduciary duty. Trails repeatedly breached that duty, as described herein, by abusing, neglecting, and labor trafficking R.B.

While North Carolina courts have been reluctant to define the term "fiduciary relation," one can be found "wherever confidence on one side results in superiority and influence on the other side; where a special confidence is reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *King v. Bryant*, 369 N.C. 451, 464 (2017)(quoting *Vail v. Vail*, 233 N.C. 109, 114 (1951). Ultimately, "[i]t is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other." *King*, 369 N.C. 464 (quoting, *Abbitt v. Gregory*, 201 N.C. 577, 598 (1931).

In *King*, the North Carolina Supreme Court examined the elements of superiority, influence, and trust to find that a de facto fiduciary relationship of "trust and confidence" existed between a prospective patient and surgeon and found an arbitration agreement void for four relevant reasons – all of which are firmly established here. *King*, 369 N.C. at 466.[4] While *King v. Bryant* addressed arbitration agreements, its fiduciary duty analysis applies with equal force to indemnification agreements that similarly attempt to shift legal responsibility away from the professional with superior knowledge and skill. *See Bryant v. Thalhimer Bros.* 113 S.E.2d 688, 692 (Va. 1960) (fiduciary relationship arising from superior knowledge and trust).

First, like the patient in *King*, the Burneys sought out Trails because of its "special knowledge and skill in diagnosing and treating diseases and injuries," which they lacked. *Id.*, quoting *Black v. Littlejohn¸* 312 N.C. 626, 646 (1985). Indeed, Trails admittedly marketed itself as having special expertise in adolescent behavioral health, being founded on 'decades of experience and scientific research,' and providing 'outstanding care and outcomes.' R.B. Compl. ¶¶ 37, 82-83; ECF No. 18, pgs. 7, 12, ¶¶ 37, 82-83). The Burneys relied on Trails' consistent representations affirming that purported expertise. R.B. Compl. ¶¶ 110-116.

Second, like the *King* patient, the Burneys demonstrated their trust and confidence in Trails when they provided it with R.B.'s confidential medical information before her admission. *King*, 369 N.C. at 466 (finding the patient "demonstrated sufficient trust and confidence in him to provide [the doctor] with confidential medical information" during the intake process). The Burneys and R.B. completed a comprehensive intake process with Trails that included a tour of AAG. R.B. Compl. ¶¶ 112-113. Trails also required R.B. and the Burneys to provide it with her confidential information during its extensive intake process. ECF No. 18-1, pg. 1, ¶ 2 (requiring the Burneys

---

[4] The North Carolina Supreme Court reached this result despite "the limitations on the use of state law to preclude enforcement of arbitration agreements…" *King*, 369 N.C. at 461.

to comply with Trails "information requests" and to provide it with consents and authorizations pre-enrollment). Trails would only admit R.B. after a "personal evaluation and screening process conducted by Trails" to determine if R.B. "satisfie[d] Trails' screening criteria…" *Id.*

Trails also required the Burneys to submit R.B.'s confidential medical information during her intake. *Id.* Trails required that the Burneys and R.B. complete the "Trails Student Medical Face Sheet." *See*, Ex. B.[5] The Face Sheet required the Burneys to provide, among other things, R.B.'s current medications and previous medical history, which included surgical history, allergies, and diagnoses. *Id.* The Burneys also submitted R.B. to a medical exam with her personal doctor and provided that doctor's findings on a standardized Trails intake form. *See* Ex. C.[6]

Third, like the patient in *King*, a physician with whom R.B. already had a fiduciary relationship referred her to Trails. R.B.. *King*, 369 N.C. at 466. In R.B.'s full enrollment packet, the Burneys provided the names of R.B.'s psychiatrist, her psychologist, and AAG as the referring healthcare providers for her admission to Trails. Ex. A. Under North Carolina law, R.B. had a fiduciary relationship with at least her psychiatrist. *King*, 369 N.C. at 464 (citing *Watts v. Cumberland County Hospital System, Inc*., 317 N.C. 110, 116 (1986)). While not a required element under *King*, this additional factor strengthens the finding of a fiduciary relationship.

Finally, in noting the superiority and influence imbalance, the *King* patient had "received a limited education and had little to no experience interpreting legal documents", unlike the surgeon. *King*, 369 N.C. at 466. R.B. turned 14 the day before the corporate funded and controlled Trails admitted her. Ex. B, at 9. The imbalance of power between a 14-year-old child and a sophisticated corporate entity backed by private equity is even more pronounced than in *King*.

### 3. Alternative Argument: Trails Cannot Seek Contribution Because of Its Intentional Acts

---

[5] Exhibit B, like Exhibit A, is a form from R.B.'s Trails enrollment packet.
[6] Exhibit C, the "Physical Examination" form is also from R.B.'s Trails' enrollment packet.

Even if Trails had not denied its own negligence (which it has) and even if it had not breached its fiduciary duty to R.B. (which it did), contribution would still be barred because of Trails' intentional acts. "There is no right of contribution in favor of any tort-feasor who has intentionally caused or contributed to the injury or wrongful death." N.C. Gen. Stat. § 1B-1(c). R.B. alleges several intentional acts. Compl. at ¶¶ 118-119 (physical assault); *Id.* at ¶¶ 132-133 (food restriction to an extremely dangerous degree); *Id.* at ¶¶ 138-140 (unpaid forced labor). These acts combine with Trails' negligence to color all of her causes of action. Accordingly, Trails cannot seek contribution for any of her claims because of its repeated intentional acts. Allowing contribution for intentional acts would eviscerate the policy behind § 1B-1(c) and reward **deliberate wrongdoing.**

## IV. CONCLUSION

In conclusion, Trails' Third-Party Complaint against the Burneys should be dismissed with prejudice for several reasons. First**,** the Indemnity Agreement is unconscionable under North Carolina law. It is substantively unconscionable because it: (1) imposes unlimited liability on the Burneys with no reciprocal obligations; (2) attempts to waive R.B.'s claims and contract away Trails' own negligence in violation of public policy; (3) weaponizes the family relationship Trails promised to heal; and (4) unlawfully shifts federal TVPRA liability from perpetrator to victim's family. It is procedurally unconscionable because Trails required it as a condition of enrollment, creating extreme disparity in bargaining power and unfair surprise.

Second, Trails cannot establish common law indemnification because: (1) the Burneys and Trails are not jointly and severally liable - their alleged conduct and Trails' abuse are temporally severed and create entirely distinct, divisible harms; (2) Trails was actively, not passively, negligent through its direct abuse of R.B.; and (3) Trails' liability is not derivative to the Burneys' because Trails acted independently after assuming exclusive custody of R.B.

24

Third, contribution is unavailable because: (1) Trails has expressly denied it was negligent, precluding any finding that it is a joint tortfeasor with the Burneys; (2) contribution is barred by N.C. Gen. Stat. § 1B-1(g) because Trails breached its fiduciary duty to R.B.; and (3) alternatively, contribution is barred by N.C. Gen. Stat. § 1B-1(c) because of Trails' intentional acts against R.B.

No amendment could cure these fundamental defects. Wherefore, this Honorable Court should dismiss Trails' Third-Party Complaint with prejudice.

Dated: October 10, 2025            **RESPECTFULLY SUBMITTED,**

*/s/ Kimberly A. Dougherty*
Kimberly A. Dougherty, Esq.
(admitted *pro hac vice*)
Keith E. Smith, Esq.
(admitted *pro hac vice*)
JUSTICE LAW COLLABORATIVE
210 Washington St.
North Easton, MA 0256
Tel: (508) 230-2700
Fax: (385) 278-0287
Email: kim@Justicelc.com
Email: keith@justicelc.com


RHINE LAW FIRM, P.C.
Joel R. Rhine, NCSB 16028
Email: jrr@rhinelawfirm.com
Ruth A. Sheehan, NCSB 48069
Email: ras@rhinelawfirm.com
1612 Military Cutoff Road, Suite 300
Wilmington, NC 28403
Tel: (910) 772-9960
Fax: (910) 772-9062


## <u>USE OF ARTIFICIAL INTELLIGENCE CERTIFICATION</u>

No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal

research sources of Westlaw and Lexis. Every statement and citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at my direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

**This the 10th day of October, 2025.**

/s/ Keith E. Smith
Keith E. Smith, Esq.
(admitted *pro hac vice*)
Kimberly A. Dougherty, Esq.
(admitted *pro hac vice*)
JUSTICE LAW COLLABORATIVE
210 Washington St.
North Easton, MA 0256
Tel: (508) 230-2700
Fax: (385) 278-0287
Email: Kim@Justicelc.com
Email: keith@justicelc.com

26

## CERTIFICATE OF SERVICE

I hereby certify that on this the 10th day of October, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of this electronic filing to all parties and or counsel of record in this action.

/s/ Ruth A. Sheean
RHINE LAW FIRM, P.C.
Joel R. Rhine, NCSB 16028
Email: jrr@rhinelawfirm.com
Ruth A. Sheehan, NCSB 48069
Email: ras@rhinelawfirm.com
1612 Military Cutoff Road, Suite 300
Wilmington, NC 28403
Tel: (910) 772-9960
Fax: (910) 772-9062

27